UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

JORDAN FERSEL, M.D.,                          :
                                              :      1:18-cv-2448 (RRM) (CLP)
                              Plaintiff,       :
                                              :
           -against-                          :
                                              :
PARAMOUNT MEDICAL SERVICES, P.C.,            :
                                              :
                              Defendant.      :

------------------------------------------------------------------ X


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**<u>HIS MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

ROTTENBERG LIPMAN RICH, P.C.
Bertrand Sellier
C. Zachary Rosenberg
The Helmsley Building
230 Park Avenue, 18th Floor
New York, New York 10169
(212) 661-3080
Attorneys for Plaintiff, Jordan Fersel, M.D.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ...................................................................................................3

    I.  Facts Relevant to Dr. Fersel's Affirmative Claims.........................................................3

        A.  The Agreement...................................................................................................3

        B.  The Parties' Course of Conduct.........................................................................4

        C.  Paramount Begins Platelet Rich Plasma Treatments .........................................5

        D.  When Negotiations for a Modification to the Agreement Break Down,
            Paramount Demands Dr. Fersel's Resignation ..................................................5

        E.  Paramount Retaliates Against Dr. Fersel by Changing
            His Schedule and Preventing Him from Earning a Living ...................................6

        F.  Paramount Fails to Pay Dr. Fersel His Earned Commissions
            and Admits that He is Entitled to Them...............................................................7

        G.  Paramount Fails to Provide Continuing Health Insurance Coverage
            to Dr. Fersel in Violation of New York Law .........................................................8

    II.  Additional Facts Relevant to Paramount's Counterclaims ...........................................8

        A.  The Agreement's Provisions Regarding Competition .............................................8

        B.  After Paramount Demands his Resignation and Prevents Him
            from Earning a Living, Dr. Fersel Signs His Own Leases.......................................9

                i.  Touch Stone Chiropractic, P.C.............................................................10
                ii.  Shashek Chiropractic P.C.....................................................................11
                iii. Van Siclen Chiropractic P.C. ...............................................................11

ARGUMENT.........................................................................................................................12

    I.  Standards on Motions for Summary Judgment............................................................12

    II.  Fersel is Entitled to Summary Judgment on His Claim for Breach of Contract
        Because Paramount Failed to Pay Him Under the Terms of their Agreement ............12

i

III. Fersel is Entitled to Summary Judgment on His Claim for Violation of New York Labor Law Article 6 Because He Was Employed by Paramount and Paramount Illegally Deducted His Wages ...................................................................................14

IV. The Court Should Award Fersel Summary Judgment Granting His Claim for A Declaratory Judgment and Dismissing Paramount's Counterclaims Because Paramount's Own Breaches of the Agreement Render the Non-Competes Unenforceable, Paramount Lacks Any Legitimate Interest in the Non-Competes, and the Non-Competes are Too Long to Be Enforceable Under New York Law ..............16

A.  Paramount Terminated Dr. Fersel's Employment and Breached the Agreement, Rendering the Non-Competes Unenforceable ......................................................16

B.  Paramount has No Legitimate Interest in the Non-Competes ..............................19

C.  The Non-Competes Are Too Long Under New York Law ...................................21

V. The Court Should Award Dr. Fersel Summary Judgment on his COBRA Claim .................................................................................................22

CONCLUSION ......................................................................................................23

# TABLE OF AUTHORITIES

**Cases**

Ahmed Elkoulily, M.D., P.C. v. New York State Catholic Healthplan, Inc.,
153 A.D.3d 768 (2d Dep't 2017) ................................................................................................. 18

Arakelian v. Omnicare, Inc.,
735 F. Supp. 2d 22 (S.D.N.Y. 2010) ........................................................................................... 17

BDO Seidman v. Hirshberg,
93 N.Y.2d 382 (1999) ................................................................................................................. 19

DeCapua v. Dine-A-Mate, Inc.,
292 A.D.2d 489 (2d Dep't 2002) ................................................................................................ 18

Devany v. Brockway Dev., LLC,
72 A.D.3d 1008, 900 N.Y.S.2d 329 (2010) ............................................................................... 14

E. Coast Res., LLC v. Town of Hempstead,
No. CV 07-2954 (ETB), 2010 WL 11629319 (E.D.N.Y. July 19, 2010) .................................... 19

Goodman v. New York Oncology Hematology, P.C.,
101 A.D.3d 1524 (3d Dep't 2012) .............................................................................................. 21

Hussey v. Joseph N. Leggio Agency, Inc.,
299 A.D.2d 690 (3d Dep't 2002) ................................................................................................ 14

In re UFG Int'l, Inc.,
225 B.R. 51 (S.D.N.Y. 1998) ................................................................................................ 17, 18

Inter-Power of New York Inc. v. Niagara Mohawk Power Corp.,
259 A.D.2d 932 (3d Dep't 1999) ................................................................................................ 19

Kieper v. Fusco Grp. Partners Inc.,
152 A.D.3d 1030 (3d Dep't 2017) .............................................................................................. 15

Long Island Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.,
164 A.D.3d 575 (2d Dep't 2018) ................................................................................................ 21

Mercedes v. Tito Transmission Corp.,
No. 15CV1170(CM)(DF), 2019 WL 102007 (S.D.N.Y. Jan. 4, 2019) ....................................... 14

RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.,
156 F. App'x 349, 350–51 (2d Cir. 2005) ................................................................................... 12

Ryan v. Kellogg Partners Institutional Servs.,
19 N.Y.3d 1 (2012) .................................................................................. 14, 15

Short v. Churchill Benefit Corp.,
No. 14-CV-4561 (MKB), 2016 WL 8711349 (E.D.N.Y. Apr. 8, 2016) ...................................... 14

Speedfit LLC v. Woodway USA, Inc.,
432 F. Supp. 3d 183 (E.D.N.Y. 2020). ................................................................ 12

Sussman Educ., Inc. v. Gorenstein,
175 A.D.3d 1188 (1st Dep't 2019) ..................................................................... 18

**Statutes**

Labor Law § 190(1) .................................................................................. 15

N.Y. Ins. Law § 3221(m) ........................................................................ 1, 2, 22

Plaintiff Jordan Fersel, M.D. ("Dr. Fersel"), respectfully submits this memorandum of law in support of his motion (the "Motion") for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure (a) granting summary judgment on (i) Dr. Fersel's claim for breach of contract in the amount of $98,190.58 plus 40% of all payments that Paramount receives in the future in connection with work performed by Dr. Fersel, (ii) Dr. Fersel's claim under the New York Labor Law in the amount of $98,190.58 in deducted wages, an additional $98,190.58 in liquidated damages, and Dr. Fersel's attorney's fees and expenses, (iii) Dr. Fersel's claim for a declaratory judgment declaring the non-competition provisions in the parties' agreement invalid; (iv) the counterclaims of defendant Paramount Medical Services, P.C. ("Paramount"), which are all based on the same non-competition provisions; and (v) Dr. Fersel's claim under COBRA and N.Y. Ins. Law § 3221(m) in the amount of $9,183.55; and (b) granting such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

Dr. Fersel seeks to recover his 40% commission that Paramount admits that he earned and that Paramount failed to pay to him after termination of his employment. There is no dispute that Dr. Fersel and Paramount entered into a valid agreement pursuant to which Paramount agreed to pay to Dr. Fersel a 40% commission on all payments that it received in connection with his work. There is no dispute that Dr. Fersel treated all of the patients at issue, that Paramount already received at least $246,476.46 in payments from those patients' insurers, and that Paramount is still seeking additional payments from those insurers in ongoing fee-arbitrations. There is also no dispute that Paramount failed to pay Dr. Fersel any commissions whatsoever in connection with these payments. At a pre-motion conference before this Court, Paramount even admitted and agreed that Dr. Fersel is entitled, at a minimum, to at least 89% of

these commissions, yet still has not paid any of them. Paramount's sole defense arises from its counterclaims, all of which are baseless, as set forth below, and which in any event, only relate to events beginning on February 1, 2018, after Dr. Fersel had already earned 92.7% of the commissions at issue. The Court, therefore, should grant Dr. Fersel summary judgment on his claim for breach of contract in the amount of $98,190.58, representing his 40% share of the payments that Paramount received for his work. See Point II, infra.

Because Dr. Fersel was Paramount's employee and Paramount illegally deducted his commissions in violation of New York's Labor Law, Dr. Fersel is entitled not only to his unpaid commissions in the amount of $98,190.58, but also additional liquidated damages in an equal amount (effectively double damages) and attorney's fees. See Point III, infra.

The Court should also grant Dr. Fersel summary judgment on his claim for a declaratory judgment declaring the non-competition portions of his agreement with Paramount unenforceable and dismissing Paramount's counterclaims arising out of those some non-competition clauses, for three separate reasons. First, Paramount terminated Dr. Fersel's employment and itself breached the Agreement, rendering the non-competition clauses unenforceable under New York law. Second, Paramount had no legitimate interest in the non-competition clauses with respect to the practices at issue because one of them never had any relationship with Paramount, another began renting space to Paramount only after Dr. Fersel's employment had already ended, and a third ended its relationship with Paramount well before entering a lease with Dr. Fersel. Third, the Non-Competes are enforceable on their face under New York law because they are too long. See Point IV, infra.

Finally, the Court should award Dr. Fersel summary judgment on his claim under COBRA and N.Y. Ins. Law § 3221(m) because Dr. Fersel complied with all of his requirements

under those laws, Paramount failed to provide him and his wife with continued health coverage, and Dr. Fersel incurred $9,183.55 in associated out-of-pocket costs.  See Point V, infra.

**STATEMENT OF FACTS**

**I.**     **Facts Relevant to Dr. Fersel's Affirmative Claims**

**A.**     **The Agreement**

Dr. Fersel is a pain management specialist.  Fersel Decl. ¶ 2.  On or about December 12, 2016, Paramount and Dr. Fersel entered into an Agreement of Engagement (the "Agreement").  Id. ¶ 3, Ex. 1.  The Agreement was signed by Jonathon Landow, M.D. ("Dr. Landow") on behalf of Paramount as its President.  Id. ¶ 4, Ex. 1.  As set forth in the Agreement, Paramount "is engaged in the practice of medicine in the New York Metropolitan area at multiple practice locations" and Paramount "desire[d] to employ [Dr. Fersel] to render medical services" on Paramount's behalf.  Id. Ex. 1 p. 1.   Pursuant to Article 2.02 of the Agreement, Dr. Fersel was obligated to "render such professional services as are assigned to [him], to or on behalf of [Paramount's] patients.  Such services shall be limited to medical and related services in one or more of [Paramount's] facilities at the option of [Paramount], from time to time."  Id. p. 2.

Pursuant to Article IV of the Agreement, Dr. Fersel "shall be paid on a monthly basis by [Paramount] for finalized work…authorized by the Company, after Company receives payment for these services rendered by [Dr. Fersel].  [Paramount] shall pay [Dr. Fersel] according to Schedule 'A'.  [Dr. Fersel's] compensation is due on or before the tenth day of the month following the month in which physician revenue is received by [Paramount]."  Fersel Decl Ex 1. pp. 2-3.  Schedule A to the Agreement, in turn, provides "As full physician compensation for physician services performed under this agreement, [Paramount] shall pay [Dr.

Fersel] 40% (FORTY PERCENT) of physician revenue which represents all monies company receives for services rendered by [Dr. Fersel]."[1]  Id. Ex 1 p. 12.

Pursuant to Article 8.01 of the Agreement, it could be terminated by either party without cause given 60 days-notice.  Fersel Decl. Ex. 1.

**B.    The Parties' Course of Conduct**

From the date of the Agreement until his last day of employment with Paramount on February 12, 2018, Dr. Fersel showed up at each location to which he was assigned and treated each patient assigned to him by Paramount.  Fersel Decl. ¶ 5.  Paramount supervised Dr. Fersel, controlled his work locations, schedule, and terms of employment, set his payment terms, and controlled the billing for the patients he treated.  Fersel Decl. ¶ 6.  At the end of the year, Paramount provided Dr. Fersel with a W-2.  Id. ¶ 7, Ex. 2.  In all respects, Paramount treated Dr. Fersel as its employee.  Id. ¶ 8.

During that time, Paramount would pay Dr. Fersel his 40% commission on the payments it received for his medical services on or about the 10th day of the month following the month in which Paramount received such payments.  Id. ¶ 9.  Due to the nature of Paramount's practice, nearly all payments it received for Dr. Fersel's work came from insurance companies. Id. ¶ 10.  Payment from the insurers was generally received about two to three months after the invoices were submitted.  Id. ¶ 11.  Insurance companies would sometime raise questions about certain invoices.  Id. ¶ 12.  If those questions could not be resolved, Paramount would retain counsel to submit the claims to arbitration ("Arbitrations").  Id. ¶ 13.  In matters subject to Arbitration, Dr. Fersel's payments would be delayed until the Arbitration was resolved.  Id. ¶ 14.

---

[1] Paramount had the exclusive right under Section VI of the Agreement to bill and collect from patients or third-party payors for work performed by Dr. Fersel under the Agreement.  See Fersel Decl. Ex. 1 p. 3.

Dr. Fersel is entitled to, and up through February 2018, would receive 40% of the amounts attributable to his services received by Paramount as a result of such Arbitrations.  Id. ¶ 15.

### C.    Paramount Begins Platelet Rich Plasma Treatments

Dr. Landow was interested in having Dr. Fersel begin treating patients with a relatively new treatment known as Platelet Rich Plasma ("PRP").  Fersel Decl. ¶ 16.  The insurance companies have asserted that PRP is an experimental treatment, and to date have refused to cover PRP.  Id. ¶ 17.  In June of 2017, Dr. Fersel began to treat a few patients with PRP.  Id. ¶ 18.  According to Dr. Landow, the anticipated insurance reimbursement for each PRP treatment would be $2,500, of which Dr. Fersel's 40% share would be $1,000.  Id. ¶ 19.  The PRP reimbursement claims became the subject of Arbitrations.  Id. ¶ 20.  During the course of the Agreement, Dr. Fersel saw about 75-80 patients per week. Id. ¶ 21.  After Dr. Fersel began treating patients with PRP, only about 2-3 patients a week were suitable for that treatment, and the remainder received standard pain management treatment.  Id. ¶ 22.

### D.    When Negotiations for a Modification to the Agreement Break Down, Paramount Demands Dr. Fersel's Resignation

During December 2017 and January 2018, Dr. Landow and Dr. Fersel discussed various potential modifications to the Agreement but were unable to reach a consensus.  Fersel Decl. ¶ 23, Ex. 3.  On January 21, 2018, Dr. Landow sent Dr. Fersel a proposal to revise the compensation formula in the Agreement.  Id. ¶ 24, Ex. 4.  The next day, Dr. Fersel replied in an email and explained why the proposed revision was unacceptable to him.  Id. ¶ 25, Ex. 5. On January 23, 2018, Dr. Landow sent an email to Dr. Fersel stating that if no new agreement was reached "we will require 60 days written notice".  Id. ¶ 26, Ex. 5.  That same day Dr. Fersel replied by email and stated "as you wish.  You have your official written notice of my termination in sixty days".  Id.

**E.** **Paramount Retaliates Against Dr. Fersel by Changing His Schedule and Preventing Him from Earning a Living**

On February 1, 2018, Dr. Landow informed Dr. Fersel that he was implementing a new schedule that would limit Dr. Fersel to administering PRP treatments, while "the other provider focuses on basic pain management." Fersel Decl. ¶ 27, Ex. 6. Dr. Landow added that because of the delay in insurance reimbursement, Paramount would give Dr. Fersel the option of receiving $150 for each PRP treatment, in which case Dr. Fersel would forfeit any claim to any future insurance reimbursement for those treatments. Id. Paramount made this change under the guise of "scheduling" to retaliate against Dr. Fersel for refusing to accept the proposed revision of the Agreement. Id. ¶ 28. Fersel objected in writing multiple times to Dr. Landow's unilateral "scheduling change". Id. ¶ 29, Ex. 7. The implementation of this change was extremely damaging to Dr. Fersel and deprived him of the ability to perform the pain management procedures that were the most significant part of his practice. Id. ¶ 30.

On February 6, 2018, Dr. Fersel reported to the location scheduled by Dr. Landow. Id. ¶ 31. Dr. Fersel spent the entire working day as instructed, but did not see a single patient who was suitable for PRP treatment. Id. ¶ 32. As a result, Dr. Fersel did not receive any compensation for seven hours of his time. Id. ¶ 33. Then, on February 8, 2018, Dr. Fersel reported to the location scheduled by Dr. Landow. Id. ¶ 34. Once again, he did not see any patients who were suitable for PRP treatment, and therefore he spent his working hours at that location without any compensation. Id. ¶ 35. In fact, of the 108 treatments performed by Paramount on February 6-8, 2018 at its various offices, not a single one was a PRP treatment. Rosenberg Decl. ¶ 3, Ex. 17. In light of Paramount's actions, Dr. Fersel ceased performing any work for Paramount after February 12, 2018. Fersel Decl. ¶ 36.

**F.  Paramount Fails to Pay Dr. Fersel His Earned Commissions and Admits that He is Entitled to Them**

Paramount made its last payment to Dr. Fersel on February 12, 2018.  Fersel Decl. ¶ 37, Ex. 8.  Beginning on March 10, 2018, Paramount failed to pay Dr. Fersel any portion of the payments that it received for work that he performed, let alone the 40% commission to which he is entitled.  Id. ¶ 38, Ex.  9.  Dr. Fersel never authorized Paramount to deduct those commissions from his pay.  Id. ¶ 39.  To date, Paramount received at least $245,476.46 for work performed by Dr. Fersel for which Paramount failed to pay any portion to Dr. Fersel.  Rosenberg Decl. ¶¶ 9-31, Exs. 20-27.  Paramount recently filed additional arbitrations in connection with work performed by Dr. Fersel, which remain outstanding.  Rosenberg Decl. ¶ 15, Ex. 23.  Upon settlement and/or conclusion of those arbitrations, Paramount will likely receive additional payments for work performed by Dr. Fersel.  Fersel Decl. ¶ 41.

At an August 1, 2019 pre-motion conference, Paramount's counsel admitted that Dr. Fersel was entitled to all commissions he earned for work performed at least up to and including January 23, 2018, the day on which he complied with Paramount's requirement that he provide notice of termination of the Agreement:

> THE COURT:  And Mr. Kim [Paramount's counsel], you concede
>
> that Dr. Fersel was entitled to whatever work he had done at least
>
> up to the point that he gave 60 days' notice, Right?
>
> MR. KIM: Yes, your Honor.

Rosenberg Decl. ¶ 2, Ex. 16.

**G.** **Paramount Fails to Provide Continuing Health Insurance Coverage to Dr. Fersel in Violation of New York Law**

In early March 2018, Dr. Fersel received notice from Paramount that he could purchase insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and Chapter 498 of the Laws of 2009 ("NY COBRA"), its New York equivalent. Fersel Decl. ¶ 42. Dr. Fersel completed the required form and sent it with a check to Paramount, which was cashed on April 26, 2018. Id. ¶ 43, Ex. 10. Dr. Fersel then sent two additional checks, the second by certified mail, to the same address as the first check, both of which were return to him. Id. ¶ 44, Ex. 11. Paramount did not inform Dr. Fersel that there was any issue with his COBRA application or that he should send his COBRA checks to a different address. Id. ¶ 45. In early June 2018, Dr. Fersel received notice from Paramount's health insurer that his COBRA insurance had been terminated. Id. ¶ 46. Dr. Fersel incurred $9,183.55 in out-of-pocket health care expenses due to Paramount's COBRA violations. Id. ¶ 47, Ex. 12.

**II.** **Additional Facts Relevant to Paramount's Counterclaims**

**A.** **The Agreement's Provisions Regarding Competition**

The Agreement contains numerous overlapping, ambiguous, and somewhat contradictory provisions concerning competition. Article 10.01 of the Agreement defines "affiliates" as "corporations with the same shareholders as [Paramount], which render medical services materially similar to those of [Paramount]" and "facilities" as "those additional locations where [Paramount] or said affiliates provides, or has, within a period of two years prior to the termination or expiration of this Agreement, provided medical services." Article 10.01 further provides that Dr. Fersel "during the term of this Agreement…and for a period of two (2) years thereafter, and at each and every facility as defined herein of [Paramount]…will not…(i) divert…any business whatsoever…(vi) seek or accept an employment, independent contractor,

8

or other arrangement of any kind whatsoever wherein the work to be performed pursuant to any

such arrangement may be located at any one or more facilities as defined herein."  Fersel Decl.

Ex. 1.

>Article 10.04 of the Agreement provides:
>
>[Dr. Fersel] shall not directly or indirectly, at any time during the term hereof and within a period of three years following termination of this Agreement (irrespective of the reason for termination), directly or indirectly solicit or permit any employees or independent contractors of [Paramount] to provide any services at [Paramount] locations or affiliated premises without prior written consent of [Paramount], nor shall they access, contact solicit and/or conduct any transaction with such said [Paramount] clients or business sources directly or indirectly, without the expressed and specific prior written permission of [Paramount].
>
>[Dr. Fersel] shall NOT directly or indirectly, at any time during the term hereof and within a period of three years following the termination of the Agreement (irrespective of the reason for termination), directly or indirectly interfere with [Paramount's] relationship with its clients, or directly or indirectly endeavor to entice away from [Paramount], any client or employee with which [Paramount] has or had a business relationship.
>
>[Dr. Fersel] agrees not to contact, initiate contact, or attempt to do business with at any time for any purpose either directly or indirectly including but not limited to any of the following: officers, directors, shareholders, consultants, attorneys, employees, accountants, agents or other affiliates of [Paramount] or otherwise referred by [Paramount], for the purpose of circumventing this agreement, the result of which shall be to interfere, prevent or limit [Paramount] from realizing a profit in accordance with the provisions of this Agreement.

Fersel Decl. Ex. 1, pp. 7-8.

### B.  After Paramount Demands his Resignation and Prevents Him from Earning a Living, Dr. Fersel Signs His Own Leases

After Paramount demanded his resignation on January 23, 2018, Dr. Fersel began

to seek out other opportunities, including leases with other medical practices.  Fersel Decl. ¶ 48.

In its counterclaims, Paramount alleges that Dr. Fersel breached the Non-Competes by entering into three leases with medical practices with which Paramount had purported relationships. [Dkt. 6] As set forth below, Paramount had no legitimate interest in preventing Dr. Fersel from entering into leases with respect to any of these medical practices.

     *i.  Touch Stone Chiropractic, P.C.*

In or around November and December, 2017, Paramount and Touch Stone Chiropractic, P.C. ("Touch Stone") contemplated entering into a "Lease and Services Arrangement" pursuant to which Paramount would lease space in Touch Stone's office located at 318 Sanguine Avenue, Staten Island, New York. DiMaggio Decl. ¶ 2. During that period, Dr. Landow and Dr. Fersel visited Touch Stone's office. Fersel Decl. ¶ 51. For reasons entirely independent of Dr. Fersel, Paramount and Touch Stone did not reach an agreement to do business with one another. Fersel Decl. ¶ 52, DiMaggio Decl. ¶ 3.

On February 1, 2018, after Paramount and Touch Stone went their separate ways and after Paramount demanded his resignation and changed his schedule in breach of its covenant of good faith and fair dealing, Dr. Fersel's company signed a Lease Agreement with Touch Stone for space at its premises. Fersel Decl. ¶ 53, Ex. 13; DiMaggio Decl. ¶ 4. Touch Stone has never employed Dr. Fersel in any capacity. Fersel Decl. ¶ 54; DiMaggio Decl. ¶ 5. Dr. Fersel played no role in Touch Stone's decision not to do business with Paramount and did not sign his company's lease with Touch Stone until more than a month after Touch Stone decided on its own accord to cease doing business with Paramount. Fersel Decl. ¶ 55, DiMaggio Decl. ¶ 6.

*ii. Shashek Chiropractic P.C.*

On or about April 19, 2018, Paramount entered a Lease and Services Agreement with Dr. Theresa Hastava of Shashek Chiropractic P.C. ("Shashek"), for premises located at 384 East 149th Street, Suite 205, Bronx, New York.  Rosenberg Decl. Ex. 6, Ex. 18; Hastava Decl. ¶ 2.  Paramount's lease with Shashek, therefore, began two months ***after*** termination of its Agreement with Dr. Fersel.  Paramount not only never assigned Dr. Fersel to work in Shashek's office, it did not even introduce Dr. Fersel to Shashek.  Fersel Decl. ¶ 56; Hastava Decl. ¶ 3.   On July 1, 2018, Dr. Fersel signed his own lease with Shashek. Fersel Decl. ¶ 57, Ex. 14; Hastava Decl. ¶ 4.

*iii. Van Siclen Chiropractic P.C.*

On or about February 1, 2017, Paramount entered into a Lease and Services Agreement with Van Siclen Chiropractic PC ("Van Siclen"), pursuant to which Paramount leased space at Van Siclen's office located at 51 Atlantic Avenue, Suite 317, Floral Park, New York (the "Floral Park Office").  Mandracchia Decl. ¶ 2, Rosenberg Decl. Ex. 19.  For reasons not relating to Dr. Fersel, Van Siclen and Paramount did not renew the Lease and Services Agreement when it expired on January 31, 2018.  Mandracchia Decl. ¶ 3.  Approximately nine months after the expiration of Van Siclen's Lease and Services Agreement with Paramount and Dr. Fersel's last day of employment with Paramount, Van Siclen offered Dr. Fersel the opportunity to rent space in its new office located at 240-19 Jamaica Avenue, Bellerose, New York (the "Bellrose Office").  Id. ¶ 4, Fersel Decl. ¶ 60.  On October 1, 2018, Dr. Fersel entered into a Commercial Sublease Agreement with Van Siclen for space in its Bellrose Office.  Fersel Decl. ¶ 62, Ex. 15, Mandracchia Decl. ¶ 5.  Dr. Fersel never worked for Paramount in Van

Siclen's Bellrose Office, Fersel Decl. 61, and Van Siclen has never employed Dr. Fersel in any of its offices in any capacity. Fersel Decl. ¶ 63, Mandracchia Decl. ¶ 6.

## ARGUMENT

## I. Standards on Motions for Summary Judgment

The Court is familiar with the well-established standard of review on a motion for summary judgment:

> Summary judgment is appropriate only where…there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. For summary judgment purposes, a fact is material if it might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Additionally, no genuine issue of material fact exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Speedfit LLC v. Woodway USA, Inc., 432 F. Supp. 3d 183, 201 (E.D.N.Y. 2020).

## II. Fersel is Entitled to Summary Judgment on His Claim for Breach of Contract Because Paramount Failed to Pay Him Under the Terms of their Agreement

To succeed on his claim for breach of contract, Dr. Fersel must show "(1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach. RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC., 156 F. App'x 349, 350–51 (2d Cir. 2005).

There is no dispute that Paramount and Fersel entered into the Agreement. See Joint Proposed Pre-Trial Order [Dkt. 24] p. 18. The Agreement provides that Dr. Fersel shall "provide professional medical services for [Paramount's] patients." Fersel Decl. Ex. 1, pp. 1.

The Agreement further provides that Dr. Fersel "shall be paid on a monthly basis by [Paramount] for finalized work…authorized by the Company, after Company receives payment for these services rendered by [Dr. Fersel]. [Paramount] shall pay [Dr. Fersel] according to Schedule 'A'. [Dr. Fersel's] compensation is due on or before the tenth day of the month following the month in which physician revenue is received by [Paramount]." Id. pp. 2-3. Schedule A to the Agreement, in turn, provides "As full physician compensation for physician services performed under this agreement, [Paramount] shall pay [Dr. Fersel] 40% (FORTY PERCENT) of physician revenue which represents all monies company receives for services rendered by [Dr. Fersel]." Id. p. 12.

Dr. Fersel treated the patients listed on Exhibit 27 to the Rosenberg Declaration. Rosenberg Decl. ¶¶ 9-32. It is undisputed that this work was authorized by Paramount, that Paramount received at least $245,476.46 for this work, it and that it did not pay Dr. Fersel for any portion of it. Id. ¶¶ 9-32, Exs. 16, 20-27. Paramount also admits that it recently filed additional arbitrations seeking further payments in connection with work performed by Dr. Fersel. Id. ¶ 15, Ex. 23. Paramount even admitted in open court that Dr. Fersel is entitled to the vast majority of his commissions for this work. Rosenberg Decl. ¶¶ 2, 33, 34, Ex. 16 pp. 6-7. Dr. Fersel's 40% commission of the $246,476.46 that Paramount received for this work is $98,190.58. Id. ¶ 32.

In light of the foregoing, there is no genuine dispute that Paramount is liable to Dr. Fersel for breach of contract in the amount of $98,190.58, reflecting Dr. Fersel's 40% commission of the funds that Paramount received from insurance companies and fee-arbitrations for the work performed by Dr. Fersel to date, plus 40% of any additional funds Paramount receives for that work in the future.[2]

---

[2] Paramount's sole defense arises from its counterclaims, which set forth its allegations that Dr. Fersel himself breached the Agreement. For the reasons set forth in Section III, *infra*, Paramount's

**III.  Fersel is Entitled to Summary Judgment on His Claim for Violation of New York Labor Law Article 6 Because He Was Employed by Paramount and Paramount Illegally Deducted His Wages**

Section 193 of New York's Labor Law "prohibits an employer from making "any deduction from the wages of an employee" unless permitted by law or authorized by the employee for certain payments made for the employee's benefit."  Ryan v. Kellogg Partners Institutional Servs., 19 N.Y.3d 1, 16 (2012).  To succeed on his claim under Section 193, Dr. Fersel must show "(1) there is an employer-employee relationship; (2) the employer makes a deduction from the employee's wages; and (3) the deduction is not otherwise permitted by law or authorized for the employee's benefit."  Short v. Churchill Benefit Corp., No. 14-CV-4561 (MKB), 2016 WL 8711349, at *8 (E.D.N.Y. Apr. 8, 2016).

To determine whether an employer-employee relationship exists, New York courts consider "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  Mercedes v. Tito Transmission Corp., No. 15CV1170(CM)(DF), 2019 WL 102007, at *8 (S.D.N.Y. Jan. 4, 2019).

---

counterclaims lack any merit.  Even if its counterclaims were meritorious, they could not materially undermine Dr. Fersel's breach of contract claim because they arise out of conduct that began after nearly all of Dr. Fersel's claims accrued.  See Hussey v. Joseph N. Leggio Agency, Inc., 299 A.D.2d 690, 691 (3d Dep't 2002) ("Defendant's counterclaim does not undermine plaintiff's claims for unpaid commissions because it arises out of conduct which occurred after the commissions were earned and due"); Devany v. Brockway Dev., LLC, 72 A.D.3d 1008, 1009, 900 N.Y.S.2d 329, 331 (2010) ("[o]nce the commission is earned, it cannot be forfeited").  Paramount admitted on the record that Dr. Fersel is entitled to payment for all work he performed through January 23, 2018, when Dr. Fersel provided written notice to Paramount of its intent to terminate the Agreement, Rosenberg Decl. Ex. 16 p. 7, and Dr. Fersel's first act of which Paramount complains was his lease agreement with Touch Stone Chiropractic dated less than two weeks thereafter on February 1, 2018.  Of the $98,190.58 currently due to Dr. Fersel, 92.7% relates to work performed by Dr. Fersel before February 1, 2018 and 89.0% relates to work performed by Dr. Fersel on or before January 23, 2018.  Rosenberg Decl. ¶¶ 33-34.

The Agreement specifically provides that Paramount "desires to employ" Dr. Fersel. Fersel Decl. Ex. 1 p. 1. Paramount could terminate the Agreement with or without cause pursuant to its terms. Id. p. 4. Paramount supervised Dr. Fersel, controlled his work locations, schedule, and terms of employment, set his payment terms, and controlled the billing for the patients he treated. Fersel Decl. ¶ 6. Paramount even provided Dr. Fersel with a W-2. Id. ¶ 7, Ex. 2. Dr. Fersel is clearly an employee under the Labor Law, so the first element of his Labor Law claim is satisfied.

Second, Paramount made a deduction from Dr. Fersel's wages. Labor Law § 190(1) clearly provides that wages "means the earnings of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, commission or other basis." In Ryan v. Kellogg Partners Institutional Servs., 19 N.Y.3d 1, 16 (2012), the Court of Appeals of New York explicitly held that an employer who failed to pay an employee's earned commission after termination of his employment deducted that employee's wages in violation of the Labor Law. Accord Kieper v. Fusco Grp. Partners Inc., 152 A.D.3d 1030, 1031 (3d Dep't 2017).

Third, the deductions were unauthorized by law or by Dr. Fersel. Fersel Decl. ¶ 39.

Since Dr. Fersel has met all elements of his claim for violation of New York Labor Law Article 6, the Court should grant him summary judgment. Under Labor Law § 198(1-a), "[i]n any action instituted in the courts upon a wage claim by an employee or the commissioner in which the employee prevails, the court shall allow such employee to recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest as required under the civil practice law and rules, and, unless the employer proves a good faith basis to

believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due." Because Paramount has not shown any good faith basis to believe that its underpayment was legal, the Court should award Dr. Fersel not only the full amount of his underpayment, all reasonable attorney's fees, and prejudgment interest, but also liquidated damages equal to 100% of the wages found to be due.

## IV.    The Court Should Award Fersel Summary Judgment Granting His Claim for a Declaratory Judgment and Dismissing Paramount's Counterclaims Because Paramount's Own Breaches of the Agreement Render the Non-Competes Unenforceable, Paramount Lacks Any Legitimate Interest in the Non-Competes, and the Non-Competes are Too Long to Be Enforceable Under New York Law

The Court should also award Dr. Fersel summary judgment on his claim for a declaratory judgment declaring that the Non-Competes are unenforceable and on Defendant's counterclaims, all of which are based on those Non-Competes. The Non-Competes are unenforceable for three separate reasons: (1) Paramount itself terminated Dr. Fersel's employment and otherwise breached the Agreement; (2) Paramount had no legitimate interest in the Non-Competes; and (3) the Non-Competes are unenforceable on their face under New York law.

### A.    Paramount Terminated Dr. Fersel's Employment and Breached the Agreement, Rendering the Non-Competes Unenforceable

On January 23, 2018, Paramount "required" Dr. Fersel provide 60-day notice of termination under the Agreement unless he would agree to Paramount's proposed modifications of it. Fersel Decl. ¶ 26, Ex. 5. Later that same day, Dr. Fersel complied with Paramount's demand and sent his 60-days' notice. Id. Thus, while Dr. Fersel nominally resigned, his resignation was in response Paramount telling him that it was "required" unless Dr. Fersel agreed

to its proposed modifications to the Agreement, and was, therefore, effectively a termination without cause.  For that reason alone, the Non-Competes are unenforceable.  See In re UFG Int'l, Inc., 225 B.R. 51, 55 (S.D.N.Y. 1998) ("an employee's otherwise enforceable restrictive covenant is unenforceable if the employee has been terminated involuntarily, unless the termination is for cause"); Arakelian v. Omnicare, Inc., 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) ("New York courts will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated").

Even if Paramount had not terminated Dr. Fersel without cause, on February 1, 2020, Paramount, knowing that Dr. Fersel could not cease employment until his 60 days-notice was complete, retaliated Dr. Fersel by unilaterally changing his schedule to provide that he would only perform PRP treatments.  Fersel Decl. ¶¶ 27-28, Ex. 6.  Those treatments are both a small fraction of Paramount's practice and rarely paid by insurers.  Fersel Decl. ¶¶ 17-22, 30.  Further evidencing its bad faith, Paramount assigned Dr. Fersel to offices on February 6 and 8, 2018 in which Paramount had no PRP patients whatsoever for Dr. Fersel to treat, so he earned nothing for those days.  Fersel Decl. ¶¶ 31-35.  Of the 108 treatments performed by Paramount on February 6-8, 2018 at its various offices, not a single one was a PRP treatment.  Rosenberg Decl. ¶ 3, Ex. 17.

Although Agreement provided Paramount with the right to set Dr. Fersel's schedule, the implied covenant of good faith and fair dealing precluded Paramount from exercising that discretion in a way that deprived Dr. Fersel of the benefit of its bargain – namely, his ability to earn a living.  As the Second Department recently explained:

> Even if a party is not in breach of its express contractual
> obligations, it may be in breach of the implied covenant of good
> faith and fair dealing when it exercises a contractual right as part of
> a scheme to deprive the other party of the benefit of its bargain.

> Technically complying with the terms of a contract while
> depriving the plaintiff of the benefit of the bargain may constitute a
> breach of the covenant of good faith and fair dealing.  Further,
> where the contract contemplates the exercise of discretion, this
> pledge includes a promise not to act arbitrarily or irrationally in
> exercising that discretion.

See Ahmed Elkoulily, M.D., P.C. v. New York State Catholic Healthplan, Inc., 153 A.D.3d 768,

770 (2d Dep't 2017).  By assigning Dr. Fersel to a schedule under which he would earn little or

nothing, Paramount violated of its covenant of good faith and fair dealing.   Paramount breached

the Agreement again on March 10, 2018, and every month thereafter, when it failed to pay Dr.

Fersel the commissions he earned for work he completed before he departed Paramount.  See

Section II, supra, Fersel Decl. ¶ 37, Ex. 9.

Since Paramount itself breached the Agreement by requiring Dr. Fersel's

resignation without cause, depriving him of the benefit of his bargain, and failing to pay his

earned commissions, Paramount cannot prevail on its own counterclaim for breaches of the Non-

Compete contained within that same Agreement.  DeCapua v. Dine-A-Mate, Inc., 292 A.D.2d

489, 491 (2d Dep't 2002) (declaring non-compete unenforceable where employer breached the

contract); In re UFG Int'l, Inc., 225 B.R. 51, 55 (S.D.N.Y. 1998) ("[e]ven a reasonably limited

covenant not to compete is unenforceable, however, if the employer has breached the

employment agreement"); Sussman Educ., Inc. v. Gorenstein, 175 A.D.3d 1188, 1189 (1st Dep't

2019) (declaring non-compete unenforceable where employer owed employee $42,520 in

commissions).[3]

---

[3] While Paramount contends that Dr. Fersel breached the Agreement first, that is both false and irrelevant.
As set forth above, Paramount demanded Dr. Fersel's resignation on January 23, 2018, effectively
terminating him.  Paramount then breached the covenant of good faith and fair dealing by unilaterally
changing his schedule to effectively remove all of his patients on February 1, 2018, the same day on
which Dr. Fersel entered into the first lease at issue under the Non-Compete.  Even if Paramount
somehow did not terminate Dr. Fersel's employment or breach the Agreement's covenant of good faith

### B.    Paramount has No Legitimate Interest in the Non-Competes

Even if Paramount had not breached the Agreement, the Non-Competes were unenforceable anyway because Paramount lacked any legitimate interest in them.  Under New York law, a non-competition agreement is only enforceable if it is "is *no greater* than is required for the protection of the *legitimate interest* of the employer."  <u>BDO Seidman v. Hirshberg</u>, 93 N.Y.2d 382 (1999) (emphasis in original).  Pursuant to <u>BDO Seidman</u>, "[e]xtending the anti-competitive covenant to…clients with whom a relationship with defendant did not develop through assignments to perform direct, substantive [professional] services would, therefore, violate the first prong of the common-law rule: it would constitute a restraint greater than is needed to protect these legitimate interests."

The facts of <u>BDO Seidman</u> are analogous to the ones at bar.  With respect to Touch Stone, Paramount had no relationship with which Dr. Fersel could interfere.  While Dr. Landow and Dr. Fersel visited Touch Stone's office, Paramount and Touch Stone decided not to do business with one another for reasons entirely independent of Dr. Fersel.  Fersel Decl. ¶ 52, DiMaggio Decl. ¶ 3.   Over a month later, after Paramount demanded Dr. Fersel's resignation

---

and fair dealing by February 1, 2018, it certainly breached the Agreement by March 10, 2018 at the absolute latest, when it failed to pay Dr. Fersel's commission.  Fersel Decl. ¶ 37, Ex. 9.

In a hypothetical universe where Dr. Fersel breached first, Paramount was required to choose between terminating the Agreement or continuing it while upholding its own obligations: "It is well settled that when one party breaches an executory contract, the adverse party has a choice—to treat the entire contract as broken and sue immediately for the breach or reject the proposed breach and continue to treat the contract as valid. The adverse party must, however, make an election and cannot at the same time treat the contract as broken and as subsisting. One course of action excludes the other." <u>Inter-Power of New York Inc. v. Niagara Mohawk Power Corp.</u>, 259 A.D.2d 932, 934 (3d Dep't 1999); <u>see also</u> <u>E. Coast Res., LLC v. Town of Hempstead</u>, No. CV 07-2954 (ETB), 2010 WL 11629319, at *3 (E.D.N.Y. July 19, 2010) ("the nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain").  Paramount clearly refused to perform its end of the bargain on March 10, 2018 at the absolute latest when it failed to pay Dr. Fersel his earned commissions, which remain unpaid.  Paramount is not entitled to demand that Dr. Fersel continue to adhere to the Non-Compete provisions of the Agreement while at the same time avoiding its own obligations thereunder.

and changed his schedule in breach of its covenant of good faith and fair dealing, Dr. Fersel's company signed a Lease Agreement with Touch Stone for space at its premises. Fersel Decl. ¶ 53, Ex. 13, DiMaggio Decl. ¶¶ 4, 6. Since Paramount had no relationship with Touch Stone at the time of the Lease Agreement, it had no "legitimate interest" in preventing Dr. Fersel from entering into that Lease Agreement. BDO Seidman, 93 N.Y.2d 382 (1999).

With respect to Shashek, Paramount did not even begin its relationship with that company until months after Dr. Fersel's last day of employment. Fersel Decl. ¶¶ 56-57, Ex. 14, Hastava Decl. ¶¶ 2, 4, Rosenberg Decl. Ex. ¶¶ 5-6, Ex. 18. Paramount never assigned Dr. Fersel to work at Shashek's offices nor even introduced Dr. Fersel to Shashek. Fersel Decl. ¶ 56, Hastava Decl. ¶ 3. Applying the Non-Competes to Shashek is, therefore, foreclosed by BDO Seidman: "[e]xtending the anti-competitive covenant to…clients with whom a relationship with defendant did not develop through assignments to perform direct, substantive [professional] services would, therefore, violate the first prong of the common-law rule: it would constitute a restraint greater than is needed to protect these legitimate interests." BDO Seidman, 93 N.Y.2d 382 (1999).

Similarly, Van Siclen terminated its relationship with Paramount for reasons having nothing to do with Dr. Fersel a full nine months before Dr. Fersel rented space from Van Siclen in a totally different office. [4] Mandracchia Decl. ¶¶ 2-5; Fersel Decl. ¶¶ 58-62, Ex. 15, Rosenberg Decl. ¶¶ 7-8, Ex. 19. Paramount, therefore, lacked any "legitimate interest" in

---

[4] Dr. Fersel's lease with Van Siclen is not even implicated by the Non-Competes, which purport to restrict Dr. Fersel from competing with Paramount at its "facilities", which the Agreement defines as "those additional locations where [Paramount] or said affiliates provides, or has, within a period of two years prior to the termination or expiration of this Agreement, provided medical services." Fersel Decl. Ex. 1. While Paramount leased space in Van Siclen's Floral Park Office, Dr. Fersel never did so. Id. ¶¶ 58-63. His lease with Van Siclen is for space in its Bellrose Office. Fersel Decl. ¶ 62, Ex. 15, Mandracchia Decl. ¶¶ 2-5, Dr. Fersel never performed any work for Paramount in Van Siclen's Bellrose Office. Fersel Decl. ¶ 61.

preventing Dr. Fersel from leasing space in Van Siclen's Bellrose Office.  <u>BDO Seidman</u>, 93

N.Y.2d 382 (1999).

### C.    The Non-Competes Are Too Long Under New York Law

Even if Paramount had not breached the Agreement and had legitimate interests in

the Non-Competes, they are too long to be enforceable under New York law.  While there are

two apparently contradictory Non-Competes in the Agreement, one for two years and one for

three years, New York courts have refused to enforce Non-Competes for doctors that are even

two years long.  <u>See</u>, <u>e.g.</u>, <u>Goodman v. New York Oncology Hematology, P.C.</u>, 101 A.D.3d

1524, 1528 (3d Dep't 2012) (declaring two year non-compete for doctor unenforceable); <u>Long

Island Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.</u>, 164 A.D.3d 575, 578 (2d

Dep't 2018) (refusing to enforce two-year non-compete for doctor).  Because Paramount

required Dr. Fersel to agree to the Non-Competes as a condition of employment and because it

engaged in bad faith by unilaterally changing Dr. Fersel's schedule to prevent him from making

a living and failing to pay his earned commissions, the Court should decline to enforce a shorter

non-competition period:

> The determination of whether an overly broad restrictive covenant
> should be enforced to the extent necessary to protect an employer's
> legitimate interest involves a case specific analysis, focusing on the
> conduct of the employer in imposing the terms of the agreement.
> Partial enforcement may be justified if an employer demonstrates,
> in addition to having a legitimate business interest, an absence of
> overreaching, coercive use of dominant bargaining power, or other
> anti-competitive misconduct.  Factors weighing against partial
> enforcement are the imposition of the covenant in connection with
> hiring or continued employment—as opposed to, for example,
> imposition in connection with a promotion to a position of
> responsibility and trust—the existence of coercion or a general
> plan of the employer to forestall competition, and the employer's
> knowledge that the covenant was overly broad.

<u>Long Island</u>, 164 A.D.3d at 578.

Because Paramount itself terminated Dr. Fersel's employment, breached the covenant of good faith and fair dealing, failed to pay Dr. Fersel his commissions, lacks any legitimate interest with respect to the offices at issue, and included a Non-Compete duration that is too long under New York law, the Court should award Dr. Fersel summary judgment, grant his claim for a declaratory judgment declaring the Non-Competes null and void, and dismiss Paramount's counterclaims, which are all based upon the Non-Competes.

## V.     The Court Should Award Dr. Fersel Summary Judgment on his COBRA Claim

Pursuant to NY COBRA, "[a] group policy providing hospital, surgical or medical expense insurance for other than accident only shall provide that if all or any portion of the insurance on an employee or member insured under the policy ceases because of termination of employment or membership in the class or classes eligible for coverage under the policy, such employee or member shall be entitled without evidence of insurability upon application to continue his hospital, surgical or medical expense insurance for himself or herself and his or her eligible dependents."  N.Y. Ins. Law § 3221(m).  "An employee or member who wishes continuation of coverage must request such continuation in writing within the sixty day period following the later of: (i) the date of such termination; or (ii) the date the employee is sent notice by first class mail of the right of continuation by the group policyholder."  N.Y. Ins. Law. § 3221(m)(2)(A).  Unlike the federal version of COBRA, New York's version of the law contains no exclusion for employers who employ less than 20 employees.

In early March 2018, Dr. Fersel received notice from Paramount that he could purchase insurance under COBRA and NY COBRA.  Fersel Decl. ¶ 42.  Dr. Fersel completed the required form and sent it with a check to Paramount, which was cashed on April 26, 2018.  Id. ¶ 43, Ex. 10.  Dr. Fersel then sent two additional checks, the second by certified mail, to the same address as the first check, both of which were return to him.  Id. ¶ 44, Ex. 11.  Paramount

did not inform Dr. Fersel that there was any issue with his COBRA application or that he should send his COBRA checks to a different address.  Id. ¶ 45.  In early June 2018, Dr. Fersel received notice from Paramount's health insurer that his COBRA insurance had been terminated.  Id. ¶ 46, Dr. Fersel incurred $9,183.55 in out-of-pocket health care expenses due to Paramount's COBRA violations.  Id. ¶ 47, Ex. 12.  Dr. Fersel, therefore, should be awarded summary judgment on his claim for COBRA violations in the amount of $9,183.55.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Dr. Fersel's motion for summary judgment and grant such other and further relief as the Court deems just and proper.

Dated: February 19, 2021
         New York, New York

ROTTENBERG LIPMAN RICH, P.C.


By: _____
         Bertrand Sellier
         C. Zachary Rosenberg
The Helmsley Building
230 Park Avenue, 18th Floor
New York, New York 10169
(212) 661-3080

Attorneys for Plaintiff Jordan Fersel, M.D.