UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X
                                                                 :
**JORDAN FERSEL, M.D.**,                                         :
                                                                 :
                              Plaintiff,                         :
                                                                 :    **MEMORANDUM DECISION AND**
                                                                 :    **ORDER**
              – against –                                        :
                                                                 :    18-CV-2448 (AMD) (ARL)
**PARAMOUNT MEDICAL SERVICES, P.C.**,                            :
                                                                 :
                              Defendant.                         :
                                                                 :
--------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

The plaintiff Dr. Jordan Fersel brings this action against the defendant Paramount

Medical Services, P.C., a healthcare corporation in New York, asserting claims for breach of

contract, unjust enrichment, quantum meruit, and violations of New York Labor Law and health

insurance law.  (ECF No. 15.)  The defendant asserts counterclaims for breach of contract,

tortious interference of contract and quantum meruit.  (ECF No. 16.)  Before the Court are the

parties' cross-motions for partial summary judgment.  (ECF Nos. 44, 51.)  For the reasons

explained below, I grant both parties' motions in part, and deny them in part.

## BACKGROUND

The plaintiff is a pain management specialist, who is licensed to practice medicine in

New York, and is a citizen and resident of New Jersey.  (ECF No. 44-1 ("Pl. 56.1") ¶ 1; ECF No.

15 ¶ 1.)  The defendant is a professional corporation "engaged in the practice of medicine in the

New York Metropolitan area at multiple practice locations" with its principal place of business in

New York.  (Pl. 56.1 ¶ 4; ECF No. 15 ¶ 2.)  It specializes in pain management treatment.  (ECF

No. 57 ("Def. 56.1") ¶ 2.)

On December 12, 2016, the parties entered into an Agreement of Engagement (the "Agreement") by which the defendant "engage[d] [the plaintiff] to provide professional medical services for [Paramount's] patients."  (Pl. 56.1 ¶ 5 (alterations in original); ECF No. 45-1 at 2.) Paramount's president Dr. Jonathan Landow signed the Agreement on the defendant's behalf. (Pl. 56.1 ¶ 4.)  Pursuant to the Agreement, the plaintiff was obligated to "render such professional services as are assigned to [him], to or on behalf of [Paramount's] patients.  Such services shall be limited to medical and related services in one or more of [Paramount's] facilities at the option of [Paramount], from time to time."  (Pl. 56.1 ¶ 5; ECF No. 45-1 at 3.) The Agreement specified that "[t]hese professional services shall include, but are not necessarily limited to the [plaintiff] maintaining records on a current basis, timely maintaining patient charts and records, and responding to all reasonable record keeping requests."  (ECF No. 45-1 at 3.)

The Agreement provided for the conditions, rate and timing of the plaintiff's compensation.  Article IV of the Agreement set the conditions and timing of compensation:

> Compensation.  Physician [the plaintiff] shall be paid on a monthly basis by the Company [the defendant] for finalized work (including completion of all underlying documentation), authorized by the Company, after Company receives payment for these services rendered by Physician (physician revenue).  Company shall pay Physician according to Schedule "A".
>
> Physician compensation is due on or before the tenth day of the month following the month in which physician revenue is received by company.  For example, physician revenue received during the month of January will be due on or before February 10th.

(*Id.* at 3-4.)  Article IV referenced Schedule A to the Agreement, which specified the plaintiff's rate of compensation.  Schedule A reads:

> Physician shall be paid on a monthly basis by the Company for finalized work (including completion of all underlying documentation), authorized by the Company, after Company receives payment for these services rendered by Physician (referred to as **"physician revenue"**).

> **As full physician compensation for physician services performed under this agreement, Company shall pay Physician 40% (FORTY PERCENT) of physician revenue which represents all monies company receives for services rendered by Physician.**

(*Id.* at 13 (emphasis in original).)

The Agreement provided that the defendant had the right to collect revenue for the plaintiff's services from both patients and insurers.  Article VI of the Agreements reads: "[Paramount] shall have the exclusive right to bill and collect from patients, or third party payors, all amounts due for services rendered to the Company's patients by Physician."  (*Id.* at 4.)  The Agreement also required the plaintiff "to cooperate with [the defendant], without additional compensation, to effectuate such billing and collection, and completing and/or executing necessary forms and documents."  (*Id.*)

Article X of the Agreement established restrictive covenants that would apply to the plaintiff during the agreement and for some time following its termination.  The parties agreed that the plaintiff's "covenant not to compete is necessary to insure [sic] continuation of the Company and irreparable harm and damage will be done to the Company in the event that Physician competes with the Company."  (*Id.* at 8.)  In pertinent part, the restrictive covenant contained a non-compete clause in Article 10.01 and a non-solicitation clause in Article 10.04. (*Id.* at 8-9.)  The non-compete clause reads as follows:

> Physician, his agents, servants, employees, or representatives, covenant that except as specified by this Agreement, during the term of this Agreement and any extension or renewal hereof and for a period of two (2) years thereafter, and at each and every facility as defined herein of the Company, he or she will not:
>
> (i) divert or attempt to divert from the Company, any business whatsoever, directly or indirectly, whether through the Company's referral sources, both current and those within a period of two years prior to the termination or expiration of this Agreement, or by any other means.

(ii) divert or attempt to divert, solicit, invite, induce or importune, either directly or indirectly, any patient of the Company into seeking treatment at any location other than an office of the Company.

(iii) influence or attempt to influence any patient of the Company not to do business with the Company.

(iv) make or permit the making of any public announcement or statement of any kind that he or she is or was formerly connected with the Company, which has as a purpose, directly or indirectly, to violate the provision of this Paragraph 10.01.

(v) induce, invite, solicit, or importune any employee of the Company to leave the employ of the Company or to become interested or in any way connected with a business similar to that of the Company.

(vi) seek or accept an employment, independent contractor or other arrangement of any kind whatsoever wherein the work to be performed pursuant to any such arrangement may be located at any one or more facilities as defined herein.

(vii) upon termination or expiration of this Agreement, treat or consult with any patient of the Company except in the case of a medical emergency or with prior written consent from the Company.

(*Id.* at 8-9.)  For the purposes of Article X, the Agreement defined the defendant's "affiliates" as "corporations with the same shareholders as [the defendant], which render medical services materially similar to those of the company," and defined "facilities" as "those additional locations where Company or said affiliates provides or has, within a period of two years prior to the termination or expiration of this Agreement, provided medical services."  (*Id.*)

The non-solicitation clause provides in part:

Physician shall not directly or indirectly, at any time during the term hereof and within a period of three years following the termination of this Agreement (irrespective of the reason for termination), directly or indirectly solicit or permit any employees or independent contractors of Company to provide any services at Company locations or affiliated premises without prior written consent of Company, nor shall they access, contact solicit and/or conduct any transaction with such said Company clients or business sources directly or indirectly, without the expressed and specific prior written permission of Company.

(*Id.* at 9.)

4

The Agreement was to run from December 12, 2016 (the "Commencement Date") for two years, "subject, however to earlier termination as . . . provided" in the Agreement.[1]  Article VIII set out the various ways the parties could terminate the Agreement with or without cause. To terminate the Agreement without cause, either party had to give 60 days' prior written notice; "however, the parties [could] terminate this Agreement immediately upon their mutual written consent."  (*Id.* at 5.)

Nearly all payments that the defendant received for the plaintiff's work came from insurance companies.  (Pl. 56.1 ¶ 15.)  Insurance companies sometimes raised questions about certain invoices.  (*Id.* ¶ 17.)  If those questions could not be resolved, Paramount retained counsel to submit the claims to arbitration.  (*Id.* ¶ 18.)  Because of delays relating to, among other things, arbitration, the defendant regularly received payments from insurers some time after the plaintiff performed the corresponding services.[2]

During the course of the Agreement, the plaintiff saw about 75 to 80 patients a week. Eventually, Dr. Landow wanted the plaintiff to treat patients with platelet rich plasma ("PRP").

---

[1] The Agreement states that it would run from the Commencement Date for two years "through and including December 11st, 2017."  (ECF No. 45-1 at 3.)  This appears to be a typographical error, as two years after December 12, 2016 would be December 11, 2018.  Neither party argues that the Agreement ended in December of 2017.

[2] The parties disagree about the length of these delays.  The plaintiff asserts that "[p]ayment from the insurers was generally received about two to three months after the invoices were submitted."  (Pl. 56.1 ¶ 16.)  The defendant contends that "[t]he payments were not typically received two to three months after invoices were submitted[,] as many times they would have to go to arbitration," which "could take more than two years."  (ECF No. 58 ("Pl. 56.1 Opp.") ¶ 16.)  The average time from the plaintiff's services to the defendant's receipt of payment from insurers does not affect my analysis.

In June of 2017, the plaintiff started treating patients with PRP.[3]  (Pl. 56.1 ¶ 23.)  The plaintiff

treated about two to three patients a week with PRP.[4]  (*Id.* ¶ 27.)

     During December of 2017 and January of 2018, Dr. Landow and the plaintiff discussed

amending the Agreement and modifying the compensation schedule, but were unable to reach an

agreement.  (*Id.* ¶ 28.)  On January 21, 2018, Dr. Landow sent the plaintiff a proposal to revise

the compensation formula in the Agreement, which the plaintiff rejected the next day.  (*Id.* ¶¶ 29-

30.)  In a January 23, 2018 email, Dr. Landow wrote the plaintiff, "If we are unable to reach an

accord, pursuant to the [A]greement[,] we will require 60 days prior written notice" of

termination without cause.  (ECF No. 45-5 at 2.)  The plaintiff replied the same day: "[A]s you

wish.  You have your official written notice of my termination in sixty days."  (*Id.*)

     Nine days later, on February 1, 2018, Dr. Landow informed the plaintiff that he was

implementing a new schedule limiting the plaintiff to PRP treatments, while another "provider

focuse[d] on basic pain management."  (Pl. 56.1 ¶ 33.)  Dr. Landow also gave the plaintiff the

option of receiving $150 for each PRP treatment, instead of 40% of physician revenue as

provided in the Agreement.  (*Id.* ¶ 34.)  The plaintiff rejected the proposed change to the

compensation schedule, and objected in writing multiples times to being limited to treating

patients with PRP.  (ECF No. 45-7.)  The plaintiff claimed that the narrowed scope of services

would reduce his expected compensation because he treated fewer PRP patients between June

and December of 2017.  (*Id.* at 8.)  On February 6 and 8, 2018, the plaintiff reported to two

---

[3] Although the defendant disputes the plaintiff's characterization of PRP as a "relatively new treatment"
(Pl. 56.1 Opp. ¶ 21), in its answer to the amended complaint, the defendant describes PRP as "relatively
new to the medical field at the time," and acknowledges that "some insurance companies have asserted
that PRP is an experimental treatment and have not yet determined whether to cover PRP."  (ECF No.
16 ¶ 96.)

[4] The defendant claims that the plaintiff "mischaracterizes" this figure, and that the plaintiff "used his
own judgment when treating patients."  (Pl. 56.1 Opp. ¶ 27.)  However, the defendant does not
challenge the plaintiff's estimate of the average number of patients he treated with PRP each week.

locations according to the defendant's schedule, but he did not treat any patients with PRP.[5]  (Pl. 56.1 ¶¶ 38-43.)  On February 12, 2018, the plaintiff stopped working for the defendant.  (*Id.* ¶ 44.)

Paramount made its last payment to the plaintiff on February 12, 2018.  (*Id.* ¶ 45.)  After March 10, 2018, the defendant received revenue for work that the plaintiff did, but did not pay the plaintiff any portion of the revenue it received for his services.  (*Id.* ¶¶ 46, 52.)  In addition, the defendant filed arbitrations in connection with work performed by the plaintiff, which remain outstanding.  (*Id.* ¶ 54.)

In early March 2018, the defendant notified the plaintiff that he could purchase insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and Chapter 498 of the Laws of 2009 ("NY COBRA"), its New York equivalent.  (*Id.* ¶ 57.)  The plaintiff completed the required form and sent it to Paramount with a check, which Paramount cashed on April 26, 2018.  (*Id.* ¶ 58.)  The plaintiff claims to have sent additional checks to the same address; those checks were returned as undeliverable, and the defendant asserts that it never received the subsequent checks.  (Pl. 56.1 Opp. ¶ 59.)  The plaintiff claims that the defendant's health insurer notified the plaintiff that his COBRA insurance had been terminated in June 2018, and that he subsequently incurred $9,183.55 in out-of-pocket health care expenses.  (Pl. 56.1 ¶¶ 61-62.)

On August 13, 2018, the plaintiff filed an amended complaint, asserting claims for breach of contract, quantum meruit, unjust enrichment, and violation of New York Labor Law and NY

---

[5] The plaintiff states that he "did not see a single patient who was suitable for PRP treatment."  (Pl. 56.1 ¶¶ 39, 42.)  The defendant responds that the plaintiff "used his own judgment in treating patients and if he felt they were not suitable for PRP treatment, that is why he did not receive compensation that day." (Pl. 56.1 Opp. ¶¶ 39, 42.)  To the extent the defendant means to suggest that the plaintiff withheld PRP treatment from otherwise suitable patients, it does not provide any basis for that suggestion.

COBRA, and seeking declaratory relief.  (ECF No. 15 at 6-11.)  On September 10, 2018, the defendant filed its answer and asserted counterclaims for breach of contract, tortious interference of contract, and quantum meruit.  (ECF No. 16 at 8-12.)  The plaintiff moves for partial summary judgment on his claims for breach of contract, violation of New York Labor Law and NY COBRA, and declaratory judgment.  (ECF No. 44-2 at 6.)  The defendant opposes and seeks partial summary judgment on its claim for breach of contract, including its claim that the plaintiff breached the Agreement's non-compete clause by working with three of the defendant's referral sources—Touch Stone Chiropractic, P.C. ("Touch Stone"), Shashek Chiropractic, P.C. ("Shashek") and Van Siclen Chiropractic, P.C. ("Van Siclen").  (ECF No. 51.)  The plaintiff opposes the cross-motion and filed a reply in support of his motion.  (ECF No. 59.)  The defendant filed a reply and an affidavit by Dr. Landow, which included exhibits filed for the first time, including a patient chart, which the defendant claims shows that the plaintiff worked on its behalf at Touch Stone's office in December of 2017.  (ECF Nos. 63, 64.)  The plaintiff requested that the Honorable Cheryl L. Pollak grant a pre-motion conference in anticipation of his motion to strike the previously unproduced exhibits, and, in the alternative, requested leave to file a sur-reply.  (ECF No. 66 at 1, 3 n.4.)  On December 15, 2021, I directed the plaintiff to address Dr. Landow's affidavit and its exhibits in a sur-reply.[6]  The plaintiff filed his sur-reply on February 4, 2021.  (ECF No. 71.)

## LEGAL STANDARD

Summary judgment is appropriate if the parties' submissions—including pleadings, deposition transcripts, affidavits and other documents in the record—show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of

---

[6] This case was assigned to me on July 6, 2021.

law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The movant has the burden of showing that no genuine dispute of material fact exists.  *Coyle v. United States*, 954 F.3d 146, 148 (2d Cir. 2020).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The "mere existence of a scintilla of evidence in support of the [moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [moving party]."  *Liberty Lobby*, 477 U.S. at 252.  Moreover, the nonmoving party must do more than point to "some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  He must instead identify the "specific facts" that demonstrate a genuine issue for trial, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), and "offer some hard evidence showing that [his] version of events is not wholly fanciful," *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).  If the nonmoving party's "evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  *Liberty Lobby*, 477 U.S. at 249-50 (citation omitted).

## DISCUSSION

The plaintiff argues that the defendant breached the Agreement because it did not pay him 40% of the revenue it has received for services he performed, and that it violated New York Labor Law by illegally deducting from or withholding his wages.  (ECF No. 44-2 at 17-21.)  The defendant contends that the plaintiff is not entitled to any portion of revenue it received after the Agreement was terminated.  (ECF No. 56 at 15.)  The defendant claims that the plaintiff violated the Agreement's non-compete clause by, among other things, poaching patients from its referral

sources, and is not entitled to compensation; the defendant also challenges the plaintiff's

calculation of the claimed wages.  (*Id.* at 23-24.)  Finally, the plaintiff argues that he is entitled to

the out-of-pocket health expenses he incurred after his COBRA insurance was terminated.  (ECF

No. 44-2 at 27.)

**I.      The Plaintiff's Breach of Contract Claim**

"The elements of a breach of contract claim under New York law are: (1) the existence of

a contract; (2) due performance of the contract by the plaintiff; (3) breach of contract by the

defendant; and[] (4) damages resulting from the breach."  *Marks v. New York Univ.*, 61 F. Supp.

2d 81, 88 (S.D.N.Y. 1999) (citation and quotation marks omitted).  Under New York law, a court

interpreting a contract is "to give effect to the intent of the parties as revealed by the language

they chose to use."[7]  *Bolt Elec., Inc. v. City of New York*, 223 F.3d 146, 150 (2d Cir. 2000); *see

also Wong v. New York Times Co.,* 297 A.D.2d 544, 547 (1st Dep't 2002) ("A contract should be

construed in accordance with the parties' purpose [and] a fair and reasonable interpretation,

consistent with that purpose, must guide the courts in enforcing the agreement.").  "[A] written

agreement that is complete, clear and unambiguous on its face must be enforced according to the

plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002).

The question for the court on a motion for summary judgment in a contract case is "whether the

contract is unambiguous with respect to the question disputed by the parties."  *Law Debenture

Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 465 (2d Cir. 2010) (quoting *Int'l

Multifoods Corp. v. Com. Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).  The court considers

extrinsic evidence only if the contract is ambiguous.  *Greenfield*, 98 N.Y.2d at 569.

---

[7] The Agreement is governed by New York law.  (ECF No. 45-1 at 11.)

"Where a contract is unambiguous, that is, where its words convey a definite and precise meaning upon which reasonable minds could not differ, its interpretation can be determined as a matter of law." *Bolt Elec.*, 223 F.3d at 150. On the other hand, if contractual language is "ambiguous and subject to varying reasonable interpretations," the parties' intent "becomes an issue of fact and summary judgment is inappropriate." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)). A contract is ambiguous if "more than one meaning may reasonably be ascribed to the language used." *Id.* "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation, unless each is a 'reasonable' interpretation." *Law Debenture*, 595 F.3d at 467 (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)) (internal quotation marks and citations omitted). Therefore, "the court should not find the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning.'" *Id.* (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

The Agreement provided that "[the plaintiff] shall be paid on a monthly basis by the [the defendant] for finalized work (including completion of all underlying documentation), authorized by the [defendant], after [it] receives payment for these services rendered by [the plaintiff] (physician revenue)." (ECF No. 45-1 at 3-4.) Schedule A specified that the defendant would pay the plaintiff 40% of physician revenue. (*Id.* at 13.) The defendant argues that the plaintiff is not entitled to payment because "the unambiguous language of the employment contract shows that . . . [the plaintiff] was not employed when Paramount received the payments from arbitration awards or voluntary payments." (ECF No. 56 at 16.) According to the defendant, "Article IV of the contract . . . says that [the plaintiff's] revenue share, 40% of the

fees collected, does not become earned until: 1) finalized work on the patient is completed; and 2) payment is received by Paramount. Finalized work includes those steps necessary for the payment to be obtained by Paramount." (*Id.* (citing ECF No. 53 ¶¶ 77-81).) The defendant's interpretations of the Agreement are not reasonable.

The Agreement defines "finalized work" as "services rendered" to a patient and the "completion of underlying documentation." (ECF No. 45-1 at 3-4.) The defendant says that "finalized work" encompasses not only patient treatment and supporting documentation, but also "those steps necessary for the payment to be obtained by Paramount." The defendant suggests that these steps "extend" to the plaintiff participating in the arbitration of a claim, as well as the arbitrator issuing a decision. (ECF No. 53 ¶ 78 ("[The plaintiff's] work with regard to many patients was not finalized until the arbitration awards were issued or denied."); *see also id.* ¶ 80 ("It is unknown whether [the plaintiff's] participation in these arbitrations, such as testimony or submitting an affidavit, would have resulted in an award rather than a denial.").) This interpretation conflicts with the plain meaning of the contract's terms and common sense. The common sense interpretation of "underlying documentation" is documentation directly related to a patient's visit, such as treatment notes or an examination report. If the parties meant to include in "finalized work" documentation for arbitrations or settlement negotiations months or years after the treatment, they surely would have specified that in the Agreement.

The Agreement's other provisions confirm the common sense view of "underlying documentation." Indeed, if the defendant were correct, other contract provisions would be unnecessary and inconsistent. For example, Article VI of the Agreement—the "Billing and Collection" section—provides that "[the plaintiff] agrees to cooperate with [the defendant], without additional compensation, to effectuate such billing and collection, and completing and/or

12

executing necessary forms and documents."[8]  (ECF No. 45-1 at 4.)  If "underlying

documentation" included documents necessary for arbitration or settlement, both Articles IV and

VI would require the plaintiff to complete this documentation as part of "finalized work,"

entitling him to compensation under Article IV, but also without additional compensation under

Article VI.

Under these circumstances, the only reasonable interpretation of "underlying

documentation" for finalized work is documentation directly related to the plaintiff's services.

*See Walker v. Thompson*, 404 F. Supp. 3d 819, 825 (S.D.N.Y. 2019) ("[A]n interpretation that

gives a reasonable and effective meaning to all terms of a contract is generally preferred to one

that leaves a part unreasonable or of no effect." (quoting *Galli v. Metz*, 973 F.2d 145, 149 (2d

Cir. 1992))).

The defendant also claims that under the Agreement, the plaintiff does not earn his share

of physician revenue until and unless the defendant receives it, and as long as the plaintiff is still

employed with the defendant.  This interpretation is problematic for three reasons.  First, the

Agreement provided that the plaintiff "shall be paid . . . for finalized work . . . , after [the

defendant] receives payment for [his] services."  The plaintiff's entitlement to 40% of the

revenue the defendant eventually receives vested when he completed "finalized work," and the

defendant's obligation to pay the plaintiff his share arises after it receives the revenue.  The

defendant's interpretation conflates these two points.[9]  Second, even if the Agreement provided

that the plaintiff was entitled to 40% of physician revenue only after the defendant received it, he

---

[8] The defendant does not allege that the plaintiff ever refused its request to complete documents or forms
necessary to effectuate billing and collection.  (ECF No. 59 at 10 n.5.)

[9] Parties can contract to align when revenue is earned and when it is received.  *See Dreyfuss v. eTelecare
Glob. Sols.-US, Inc.*, No. 08-CV-1115, 2010 WL 4058143, at *8 (S.D.N.Y. Sept. 30, 2010) ("[T]he
2006 Plan clearly provides that commissions are earned based upon the receipt of revenue . . . .").
However, as the Agreement makes plain, the parties did not do so in this case.

would still be owed his share after the Agreement's termination as the defendant receives

payments.  Nothing in the Agreement requires that in order to be paid, the plaintiff had to be

working for the defendant when it receives payment.  *See Apple Mortg. Corp. v. Barenblatt*, 162

F. Supp. 3d 270, 290 (S.D.N.Y. 2016) ("While the Compensation Agreements do not provide for

commissions on loans as soon as they are arranged or originated . . . , the Compensation

Agreements do not make employment during the payroll payment period a condition of

payment." (quotation marks omitted)).  Third, New York has a policy against forfeiture of earned

wages.[10]  *See Dreyfuss*, 2010 WL 4058143, at *5 ("New York Labor Law reflects the state's

longstanding policy against the forfeiture of earned but undistributed wages." (citation and

quotation marks omitted)).

By not paying the plaintiff 40% of revenue that it received for his services since the

Agreement's termination, the defendant began to breach the Agreement on March 10, 2018.[11]

Summary judgment is granted in favor of the plaintiff as to his breach of contract claim.

---

[10] According to the defendant, the parties' fee sharing agreement "fundamentally resembles a commission agreement," and the plaintiff "does not differ from a commissioned salesman."  (ECF No. 56 at 16-17.) The defendant concludes that "[e]mployees are not entitled to post-termination commissions unless the employment contract expressly says so."  (*Id.* at 17.)  It cites various cases to support its claim: *Apple Mortg. Corp*, 162 F. Supp. 3d at 289; *Bravia Cap. Partners, Inc. v. Fike*, 2011 WL 6081345, at *3 (S.D.N.Y. Dec. 6, 2011); *Mackie v. LaSalle Indus.*, 92 A.D.2d 821, 822, (1st Dep't 1983); and *Linder v. Innovative Com. Sys. LLC*, 41 Misc.3d 1214(A), at *3 (N.Y. Sup. Ct. 2013).

But these cases involve salespeople who started relationships or deals that closed after their employment terminated.  *See, e.g.*, *Apple Mortg. Corp.*, 162 F. Supp. 3d at 276 (former employees sought commissions for loans that closed after they left the company); *Bravia*, 2011 WL 6081345, at *3 (former employee argued that for clients she brought to the company, she was entitled to commissions on transactions that closed after her termination); *Mackie*, 92 A.D.2d at 822 (same).  Here, the plaintiff seeks compensation for work finalized before the Agreement's termination.  The defendant cites no authority that applies the presumption against entitlement to post-termination commissions in a context similar to this.

[11] At the pre-motion conference, I asked the defendant's counsel if he "concede[d] that [the plaintiff] was entitled to whatever work he had done at least up to the point that he gave 60 days' notice," and counsel answered, "Yes."  (ECF No. 44-1 at 8.)  The plaintiff maintains that the defendant is bound by counsel's response.  (ECF No. 56 at 17-18; ECF No. 59 at 8-9.)  Because I find that the plain language of the Agreement is unambiguous, I do not address this issue.

## II.     The Plaintiff's Breach of Contract Damages

The parties dispute the amount to which the plaintiff is entitled under the Agreement.

The plaintiff claims that the defendant owes him $98,190.58, which is 40% of the $245,476.46

that the defendant got in physician revenue since the Agreement's termination.  (ECF No. 44-2 at

18.)  The defendant contends that it received only $131,079.91 in physician revenue and that if

the plaintiff is entitled to damages, he is owed $52,439.16.  (ECF No. 56 at 23.)  "In considering

whether to grant summary judgment on damages, the question is whether [the] defendant[] ha[s]

submitted evidence that raises a factual dispute as to the amount of damages" owed to the

plaintiff.  *King v. Unique Rigging Corp.*, No. 01-CV-3797, 2005 WL 2290585, at *4 (E.D.N.Y.

Sept. 20, 2005).  As discussed above, the plaintiff is entitled to 40% of revenue that the

defendant has received and will receive for the plaintiff's services since the Agreement's

termination.

In support of his calculations, the plaintiff submits a spreadsheet listing patients that he

claims to have treated, as well as associated payments the defendant has received but not paid.[12]

The defendant cites the declaration of its corporate accountant, Christopher Singh, who said that

the plaintiff "included in his [damages] calculations the filing fee for the [American Arbitration

Association ("AAA")] arbitrations, the attorneys' fee paid after an arbitration award was

awarded, and interest calculations."  (ECF No. 56 at 23 (citing ECF No. 54 ¶ 9).)  The defendant

contends that "[i]nstead, the calculations should only include the principal amount received from

AAA arbitration awards and any payments voluntarily received from no-fault insurance

---

[12] The defendant makes no reference to its own records and cites no evidence to undercut the plaintiff's
spreadsheet.  Nor does the defendant meaningfully dispute the accuracy of the patient list in the
plaintiff's spreadsheet, other than to say that it "neither admits nor denies" the plaintiff's assertion that
he treated those patients, "the document speaks for itself" and the "[d]efendant has no personal
knowledge of the document."  (Pl. 56.1 Opp. ¶ 48.)

carriers." (*Id.*)  In addition, the defendant claims that the plaintiff "wrongly included AAA awards where the AAA status was only 'acknowledged'—not awarded[.]" (*Id.*)

As an initial matter, the defendant's argument about interest payments in arbitration awards is meritless.  The arbitration decisions give the break-down of each award, and show the principal amount, interest, attorney's fees, and filing fees.[13]  The plaintiff is correct that "[t]he interest payments awarded in connection with arbitrations are meant to compensate for the delay in issuance of the payment.  This delay affects both Paramount and [the plaintiff] alike[.] . . ." (ECF No. 59 at 18-19.)  In the context of the Agreement, interest on a principal in a claim for the plaintiff's constitutes "monies [the defendant] receives for services rendered by [the plaintiff]." (ECF No. 45-1 at 13.)  The defendant does not explain why the plaintiff is not entitled to his share of arbitration award interest payments, nor does it cite any authority for its position.

The defendant also maintains that the plaintiff included in his calculation attorney's fees and filing fees, citing Singh's assertion that "[the plaintiff's] inflated claim for fees owed to him is based upon his error including the attorneys' fees, interest and filing fee in the gross number from which his 40% was to be determined."[14]  (ECF No. 54 ¶ 10.)  The plaintiff responds that he "specifically excluded attorney's fees and AAA filing fees from his calculation." (ECF No. 59 at 18 & n.10.)  A review of the plaintiff's damages spreadsheet and the associated arbitration awards shows that the plaintiff correctly excluded attorney's fees and AAA filing fees with respect to some arbitrations.  For example, a March 4, 2019 arbitration decision awarded the defendant $3,632.90 for a patient's treatment— $2,592.50 was principal, $401.58 was interest, $598.82 was attorney's fees, and $40 was the filing fee.  The plaintiff's spreadsheet lists

---

[13] The plaintiff filed unredacted arbitration decisions under seal.

[14] The defendant does not argue that he is entitled to 40% of revenue the defendant receives in arbitration awards for attorney's fees or filing fees.

$2,994.08 as the physician revenue, which correctly reflects the awarded principal and interest. (ECF No. 46-27 at 30.)  However, for some claims, the plaintiff appears to have included attorney's fees and filing fees.  An April 25, 2018 arbitration notice of settlement awarded the defendant $4,601.20 for treatment rendered;  $3,800 of that is principal, $1 is interest, $760.20 is attorney's fees, and $40 is the filing fee.  In his spreadsheet, the plaintiff claims $4,301 for the patient's treatment, but at least some of that seems to be attorney's fees and/or filing fees.  (ECF No. 46-27 at 18.)  There are similar discrepancies in other arbitration awards or settlements and the plaintiff's claimed amounts.

The defendant's claim that the plaintiff "wrongly included AAA awards where the AAA status was only 'acknowledged'– not awarded" does not create a factual dispute about damages. Singh designates claims for some of the plaintiff's services as "acknowledged," (*see, e.g.*, ECF No. 54-1 at 3), which, according to the defendant, "means [that the] AAA did not yet issue an award, if it is going to at all."  (ECF No. 56 at 23.)  But Singh's spreadsheet does not make this distinction; indeed, it is not clear what effect, if any, the "acknowledged" designation has on the damages calculation.  For example, Singh's spreadsheet identifies a February 6, 2017 claim as "acknowledged," but also states that the defendant received a check for $148.69.  (ECF No. 54-1 at 3.)  The plaintiff's spreadsheet, on the other hand, reflects that the defendant received an arbitration award of $787.74 for the claim (ECF No. 46-27 at 3), and submits under seal documentation of the corresponding decision, which support's the plaintiff's position.  For other claims that Singh designates as "acknowledged," the plaintiff's spreadsheet does not suggest that the defendant received any revenue.  (*Compare, e.g.*, ECF No. 54-1 at 3 *with* ECF No. 46-12 at 4.)  With respect to this issue, the defendant does not demonstrate a factual dispute as to the amount of damages claimed by the plaintiff.

To the extent that the plaintiff's damages calculations include attorney's fees and filing fees the defendant recovered through arbitration or settlement, the defendant has shown a factual dispute as to the amount of damages owed to the plaintiff. *King*, 2005 WL 2290585, at *4. Summary judgment is denied with respect to the amount of damages the plaintiff is entitled to under his breach of contract claim.[15] *See Howe v. Bank of New York Mellon*, 783 F. Supp. 2d 466, 472 (S.D.N.Y. 2011) ("A court may bifurcate issues of liability and damages and grant summary judgment as to one but not the other." (citation omitted)). The plaintiff may, however,

---

[15] The defendant argues that the plaintiff's "damages are offset by the damages Paramount is entitled to under its counterclaims," and "[t]his precludes summary judgment as to his damages." (ECF No. 56 at 24.) Although the Court denies summary judgment as to the plaintiff's breach of contract damages amount, the defendant cites no authority for the proposition that summary judgment for a claim to damages is precluded by the mere possibility of counterclaim damages.

The defendant also argues that the faithless servant doctrine precludes an award of damages. The defendant acknowledges that it did not plead the faithless servant doctrine as an affirmative defense, and that the time for moving to amend expired on August 31, 2018; it now seeks leave to amend its answer. (ECF No. 56 at 18-19.)

"New York courts . . . apply two alternative standards for determining whether an employee's conduct warrants forfeiture under the faithless servant doctrine." *Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 84 (S.D.N.Y. 2015) (citation and quotation marks omitted). "The first—and more stringent—standard is satisfied where the misconduct and unfaithfulness . . . substantially violates the contract of service such that it permeate[s] [the employee's] service in its most material and substantial part. [T]he second standard requires that the agent's misconduct rise[ ] to the level of a breach of a duty of loyalty or good faith." *Id.* (alterations in original) (citations and quotation marks omitted). "[A] disloyal employee forfeits only compensation earned in connection with the specific tasks as to which he was disloyal" and "retains compensation earned in connection with the specific tasks as to which he was loyal" when "(1) the parties had agreed that the agent will be paid on a task-by-task basis . . . , (2) the agent engaged in no misconduct at all with respect to certain tasks, and (3) the agent's disloyalty with respect to other tasks neither tainted nor interfered with the completion of the tasks as to which the agent was loyal." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 205 (2d Cir. 2003) (citation and quotation marks omitted).

The defendant has not satisfied either faithless servant standard. Even if it had, forfeiture would not be appropriate because the plaintiff was paid on a task-by-task basis, and the defendant has not established that misconduct or disloyalty affected his treatment of the defendant's patients. *Id.* at 203 n.14 (distinguishing between whether an employee was a faithless servant and whether forfeiture should be limited). Because amendment would be futile, I deny the defendant's motion to amend its answer to add the faithless servant doctrine as an affirmative defense. "One appropriate basis for denying leave to amend is that the proposed amendment is futile." *See Bild v. Konig*, No. 09-CV-5576, 2014 WL 3015236, at *6 (E.D.N.Y. July 3, 2014).

request an inquest to establish breach of contract damages, exclusive of attorney's fees and filing fees.

## III.    Quantum Meruit and Unjust Enrichment

Applying New York law, the Court "may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005).  "In order to recover in quantum meruit under New York law, a claimant must establish (1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services."  *Id.* (citation and quotation marks omitted).  "New York law does not permit recovery in quantum meruit, however, if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim."  *Id.* (citing *Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.,* 70 N.Y.2d 382, 388 (1987); *Ellis v. Abbey & Ellis,* 294 A.D.2d 168 (1st Dep't 2002); *Mariacher Contracting Co., Inc. v. Kirst Constr., Inc.,* 187 A.D.2d 986 (4th Dep't 1992)).  The restriction on quantum meruit claims bars recovery by the plaintiff here.  The Court has entered summary judgment in the plaintiff's favor on his breach of contract claim.  Thus, "[h]aving successfully brought a breach-of-contract claim based on [the] defendant's failure to compensate [him] for the services [he] provided, [the] plaintiff may not recover a second time through quantum meruit."  *Id.* (citation omitted).  Summary judgment is granted in favor of the defendant as to the plaintiff's quantum meruit and unjust enrichment claims.

## IV.    New York Labor Law

"Section 193 [of New York's Labor Law] prohibits an employer from making any deduction from the wages of an employee unless permitted by law or authorized by the employee for certain payments made for the employee's benefit."  *Ryan v. Kellogg Partners Institutional*

*Servs.*, 968 N.E.2d 947, 956 (2012).  To prevail on a Section 193 claim, a plaintiff must show

that "1) there is an employer-employee relationship; (2) the employer makes a deduction from

the employee's wages; and (3) the deduction is not otherwise permitted by law or authorized for

the employee's benefit."  *Short v. Churchill Benefit Corp.*, No. 14-CV-4561, 2016 WL 8711349,

at *8 (E.D.N.Y. Apr. 8, 2016) (citing *Hudacs v. Frito-Lay, Inc.*, 90 N.Y.2d 342, 346-47 (1997)).

Section 198(1-a) of the New York Labor Law permits an "employee to recover the full amount

of any underpayment" of wages, "all reasonable attorney's fees, prejudgment interest . . . , and[]

. . . an additional amount as liquidated damages equal to one hundred percent of the total amount

of the wages found to be due[.] . . ."  N.Y. Lab. L. § 198(1-a).

 The plaintiff argues that he is "entitled not only to his unpaid commissions . . . , but also

additional liquidated damages in an equal amount (effectively double damages) and attorney's

fees" because he was "Paramount's employee and Paramount illegally deducted his commissions

in violation of New York's Labor Law."  (ECF No. 44-2 at 7.)  The defendant asserts that

"[s]ince [the plaintiff] was not entitled to compensation after he left Paramount, it is impossible

for Paramount to have impermissibly deducted those wages."  (ECF No. 56 at 24.)  As discussed

above, the plaintiff is entitled to 40% of the physician revenue that the defendant receives after

the Agreement's termination.  However, the plaintiff cannot recover under Section 193 because

the defendant's wholesale withholding of payment is not a "deduction" within the meaning of

New York Labor Law.

 "In order to state a claim for a violation of NYLL § 193, a plaintiff must allege a specific

deduction from wages and not merely a failure to pay wages."  *Goldberg v. Jacquet*, 667 F.

App'x 313, 314 (2d Cir. 2016); *see also Jensen v. AR Glob. Invs., LLC*, No. 19-CV-657, 2020

WL 1322584, at *6 (S.D.N.Y. Mar. 20, 2020).  "It is well established that a 'wholesale

20

withholding of payment,' however, 'is not a "deduction" within the meaning of Labor Law § 193.'" *Jensen*, 2020 WL 1322584, at *6 (quoting *Perella Weinberg Partners LLC v. Kramer*, 153 A.D.3d 443, 449 (1st Dep't 2017)); *see also Perella Weinberg*, 153 A.D.3d at 449 (collecting cases). "A deduction is more targeted and direct than the wholesale withholding of wages and New York courts recognize that the purpose of section 193 is to place the risk of loss for such things as damaged or spoiled merchandise on the employer rather than the employee." *Goldberg*, 667 F. App'x at 314 (citations and quotation marks omitted); *see also Komlossy v. Faruqi & Faruqi, LLP*, No. 15-CV-9316, 2017 WL 722033, at *14 (S.D.N.Y. Feb. 23, 2017) ("[T]he majority, and more persuasive, interpretation of § 193 is that it has nothing to do with failure to pay wages or severance benefits, governing instead the specific subject of making deductions from wages." (citation omitted)), *aff'd*, 714 F. App'x 11 (2d Cir. 2017). "Section 193 therefore 'requires something more' than simply alleging a 'total withholding of wages,' such as 'a specific instance of docking the employee's pay.'" *Jensen*, 2020 WL 1322584, at *6 (quoting *Gold v. Am. Med. Alert Corp.*, No. 14-CV-5485, 2015 WL 4887525, at *2 (S.D.N.Y. Aug. 17, 2015)); *see also Gold*, 2015 WL 4887525, at *2 (collecting cases).

The plaintiff has not shown "any deduction" from wages because he claims that the defendant withheld the entirety of his share of physician revenue that the defendant received after the Agreement's termination, which is the essence of his breach of contract claim. Summary judgment is granted in favor of the defendant as to the plaintiff's New York Labor Law claim.

## V. The Plaintiff's COBRA Claim

The plaintiff claims that the defendant owes him "$9,183.55 in out-of-pocket health care expenses due to Paramount's COBRA violations." (ECF No. 44-2 at 28.) Citing New York Insurance Law § 3221(m)(3), which provides that "an employee or member electing continuation

must pay to the group policyholder or his employer . . . [,]" he argues that "[a]s the entity collecting his COBRA payments, Paramount had the incidental obligation to notify [the plaintiff] of its change in address that resulted in his payments being returned to him."  (ECF No. 59 at 28.)  The defendant responds that "[u]nder NY COBRA, Paramount's obligations to [the plaintiff] regarding NY COBRA ceased after it informed [him] of his right to continue his insurance coverage."  (ECF No. 56 at 30-31 (citing N.Y. Ins. § 3221(m); *Rambam v. Oxford Health Plans, Inc.*, 306 A.D.2d 467, 468 (2d Dep't 2003) (holding that the plaintiff's group health insurance policy was properly canceled where the "plaintiff failed to remit premiums in timely fashion")).)

The NY COBRA provision that the plaintiff cites does not require an employer to notify a former employee of a change in address, and the plaintiff cites no authority to support his position.  Summary judgment is granted in favor of the defendant as to the plaintiff's claim relating to his health care expenses.

## VI.    The Defendant's Breach of Contract Claim

The defendant moves for summary judgment on its counterclaim for breach of contract against the plaintiff, and it claims that his engagement with Paramount's referral sources—Touch Stone, Shashek and Van Siclen (collectively the "Referral Sources")—violated the Agreement's restrictive covenants.  The parties disagree about whether the restrictive covenants are enforceable.  (ECF No. 44-2 at 21-27; ECF No. 56 at 24-29; ECF No. 59 at 22-27.)  I first determine whether the defendant has established any violation of the restrictive covenant.

### a.    Whether the Defendant Established a Breach of the Non-Compete Clause

The substance of the defendant's breach of contract claim is not entirely clear.  In its answer to the complaint and counterclaims, the defendant alleges that the plaintiff breached the Agreement by "poaching Paramount's clientele with the intent to harm the business of

Paramount to the sole benefit of [the plaintiff], in direct contravention of Article VII and Article X . . . ."  (ECF No. 16 ¶ 103 (emphasis omitted).)  Article VII of the Agreement addresses patient confidentiality.  (ECF No. 45-1 at 5.)  In its submissions to the Court, the defendant asserts that the plaintiff "misunderstands Paramount's claim under the restrictive covenant," and that "[o]nly the two-year non-compete in Article 10.01 is [at] issue."  (ECF No. 56 at 25.)  For the purposes of the defendant's cross-motion for summary judgment, the Court considers only the non-compete clause in Article 10.01 of the Agreement.

By its terms, the Agreement limits the non-compete clause to "the term of this Agreement and any extension or renewal hereof and for a period of two (2) years thereafter," and its geographic scope to "each and every facility as defined herein of the Company."  (ECF No. 44-1 at 8.)  For the purposes of Article X, the Agreement defines "facilities" as "those additional locations where Company or said affiliates provides or has, within a period of two years prior to the termination or expiration of this Agreement, provided medical services."  (*Id.*)

The defendant claims at one point that "[p]aragraph 10.01 prohibited [the plaintiff] from seeking a position with Paramount's referral sources and from working with the facilities where Paramount treated patients."  (ECF No. 56 at 9.)  At another point, the defendant asserts that "[t]he restrictive covenant is limited only to the offices where the Referral Sources operate," and that "[t]his means [the plaintiff] could work in a medical office next door to one of the Referral Sources so long as it was not within the same office as the Referral Source."  (*Id.* at 27-28.)  The non-compete clause does not cover every office of the Referral Sources, but instead clearly defines "facilities" as those locations where the defendant "provides or has . . . provided medical services" in the two years prior to the Agreement's termination.

Perhaps recognizing that its interpretation requires a strained reading of the defined term "facilities," the defendant claims that "[e]ven though Paramount operated at certain facilities owned by the Referral Sources, it always could travel to any facility of theirs to provide pain management treatment making the referral sources . . . not location specific."  (ECF No. 56 at 12; *see also id.* at 28 ("[The plaintiff] came to know of the Referral Sources through Paramount whether or not Paramount operated at the specific offices where [the plaintiff] and his entities now operate.").)  The Agreement defines "facilities" as specific to locations where the defendant actually provided medical services during the two years before the Agreement's termination. The defendant's request to read additional terms into Section 10.01 of the Agreement with respect to the non-compete clause's scope conflicts with its plain language and is not reasonable. *See Law Debenture*, 595 F.3d at 467.

I turn to whether the defendant has established a violation of the restrictive covenant in Section 10.01.  The defendant argues that the plaintiff violated the non-compete clause by "treat[ing] patients referred by the Referral Sources covered by the restrictive covenant before he left Paramount's employment at facilities where Paramount was operating."  (ECF No. 56 at 12.)

The defendant has established that Touch Stone is a facility covered by the restrictive covenant.  Touch Stone has one location in Staten Island, New York.  (Pl. 56.1 ¶ 68.)  The defendant asserts that Paramount provided medical services at Touch Stone during the relevant period; indeed, the plaintiff treated patients at Touch Stone a few months before the Agreement's termination.  (ECF No. 63 at 11.)  The defendant includes a redacted patient chart with the

24

plaintiff's name at the top, dated December 6, 2017.[16]  (ECF No. 63-2.)  The plaintiff

acknowledges that the chart shows that he treated patients at Touch Stone on that day (ECF No.

71 at 1), but seems to argue that his work at Touch Stone on the defendant's behalf is irrelevant

because "Paramount's attempts to enter into a relationship with Touch Stone broke down prior to

[the plaintiff's] independent agreement to rent space from Touch Stone," and because neither

party received pay for the December 6, 2017 services.  (ECF No. 71-1 at 8-9.)  But under Article

10.01, a facility covered by the non-compete clause is a location where the defendant "provided

medical services" in the two years prior to the Agreement's termination, irrespective of any

relationship or payment.

     The defendant has also established that the plaintiff independently treated patients at

Touch Stone during the restrictive covenant's term.  The defendant points to three arbitration

---

[16] "[W]here new evidence is presented in a party's reply brief or affidavit in further support of its summary judgment motion, the district court should permit the nonmoving party to respond to the new matters prior to disposition of the motion." *Kelly v. Times/Rev. Newspapers Corp.*, No. 14-CV-2995, 2018 WL 1701999, at *7 (E.D.N.Y. Feb. 15, 2018), *report and recommendation adopted*, No. 14-CV-2995, 2018 WL 1701945 (E.D.N.Y. Mar. 31, 2018).  "[D]istrict courts have broad discretion to rely on evidence submitted with reply papers." *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 226 (2d Cir. 2000) (citing *Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Republic of Venezuela*, 341 F. App'x. 722, 724 (2d Cir. 2009)).  The defendant's reply and its exhibits "do not raise any new arguments, but instead respond to various factual assertions made by [the plaintiff] in opposition to the motion for summary judgment," specifically that the defendant does not have evidence of it providing medical services at Touch Stone.  *Kelly*, 2018 WL 1701999, at *7; (*see also* ECF No. 59 ("Had Paramount actually performed medical services at Touch Stone's office, it would, of course, have billing and medical records proving that it performed such a treatment.").)

In his sur-reply, the plaintiff contends that I should not consider the defendant's exhibit because the plaintiff has not been able to "ask Paramount or Touch Stone who made the chart, how it came into being, and what it means."  (ECF No. 71-1 at 7.)  But he acknowledges that the chart shows that "during the day that Dr. Landow and [the plaintiff] visited Touch Stone's office to explore a possible relationship, [the plaintiff] was asked to treat some patients, which he did . . . ."  (ECF No. 71 at 1; *see also* ECF No. 71-1 at 9.)  Although the chart was not exchanged during discovery, the "[p]laintiff either was or should have been aware of [its] existence" because he treated patients at Touch Stone on December 6, 2017, and he "cannot claim he was surprised or prejudiced by the [defendant's] reliance on the . . . record[] in question."  *Kelly*, 2018 WL 1701999, at *7.

decisions that list the plaintiff and Touch Stone, and claims that "[w]hile [plaintiff] was still employed by Paramount, he treated patients with an entity he created called the Center for Neurorestorative Medicine at the same facility Touch Stone operated from." (Def. 56.1 ¶ 36; ECF Nos. 53-2, 53-3, 53-4.) The plaintiff argues that two of the decisions do not specify whether he treated the patients at Touch Stone, but he acknowledges that the third decision reflects that he treated a patient at Touch Stone on January 26, 2018. (Def. 56.1 Opp. ¶ 36.) The plaintiff also acknowledges that he entered into a lease and services agreement with Touch Stone on February 1, 2018. (Pl. 56.1 ¶ 71.) It is not clear how many patients he has treated at Touch Stone since then, and the plaintiff asserts that "Touch Stone has never employed [him] in any capacity." (ECF No. 44-2 at 15.) However, the plaintiff's lease agreement violates the non-compete clause's prohibition against "seeking or accepting an . . . independent contractor or other arrangement of any kind whatsoever" at a covered facility. (*See* ECF No. 45-1 at 8.) The defendant has established that with respect to Touch Stone, the plaintiff violated the Agreement's non-compete clause.[17]

The same is not true of Shashek and Van Siclen because the defendant has not established that these were "facilities" within the meaning of Article 10.01. Shashek has a single location in the Bronx, New York. (Pl. 56.1 ¶ 74.) The defendant does not claim that it provided medical services at Shashek in the two years before the Agreement's termination. It asserts only that "Touch Stone, Shashek, and Van Siclen would refer patients who they believed needed pain management care to Paramount," and that it "would then send doctors to their facilities to

---

[17] Neither party addresses the measure of damages. The defendant claims that the plaintiff's work with the Referral Sources "took business away from" it, but does not specify, for example, the claimed lost profits. (ECF No. 56 at 21.) This does not bar the defendant's breach of contract claim because "nominal damages are always available in breach of contract actions." *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (quoting *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 987 (1993)).

perform whatever pain management was necessary on those patients." (Def. 56.1 ¶ 35.) The defendant does not specify when it provided medical services at Shashek and, therefore, does not establish that Shashek is a facility covered by the restrictive covenant.

Van Siclen maintains at least two locations: one in Floral Park, New York (the "Floral Park office") and the other in Bellerose, New York (the "Bellerose office"). The plaintiff acknowledges that he independently provided services at Van Siclen's Bellerose office, but claims that he did not breach the non-compete clause because the defendant provided medical services only at the Floral Park office. (ECF No. 44-2 at 16-17; ECF No. 44-1 ¶¶ 78-82.) The defendant appears to concede that it did not provide medical services at the Bellerose office during the relevant period (ECF No. 63 at 11 ("[The plaintiff] wrongly claims he was permitted to operate out of Van Siclen's Bellerose office because Paramount never operated at this location.")), and argues that the plaintiff "was prohibited from working in any location which was run by a referral source of Paramount." (*Id.* at 11-12; *see also* Pl. 56.1 Opp. ¶ 80 ("Van Siclen is a referral source[,] and it does not matter which location [the plaintiff] worked in.").) As discussed above, the defendant's broad interpretation of "facilities" is unreasonable.

Because the defendant has not established that the non-compete clause covers Shashek or Van Siclen's Bellerose office, its claims related to those locations must be dismissed.

### b.    **Enforceability of the Non-Compete Clause**

Having limited the defendant's breach of contract claim to the plaintiff's independent work at Touch Stone, I address the issue of the enforceability of Agreement's restrictive covenant. The plaintiff argues that the non-compete clause is unenforceable for three reasons: "Paramount itself terminated [the plaintiff's] employment and otherwise breached the Agreement;" "Paramount had no legitimate interest in" the non-compete clause; and the non-

compete clause is "unenforceable on [its] face under New York law." (ECF No. 44-2 at 21.) I address the plaintiff's arguments in turn.

"New York courts 'will not enforce a non-competition provision in an employment agreement where the former employee was involuntarily terminated.'" *Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 41 (S.D.N.Y. 2010) (quoting *SIFCO Indus., Inc. v. Advanced Plating Techs., Inc.*, 867 F. Supp. 155, 158 (S.D.N.Y. 1994)). "An essential aspect [of enforceable restraints on employee mobility] is the employer's continued willingness to employ the party covenanting not to compete." *SIFCO*, 867 F. Supp. at 158 (alterations in original) (quoting *Post v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 397 N.E.2d 358, 360 (1979)). "Enforcing a noncompetition provision when the employee has been discharged without cause 'would be "unconscionable" because it would destroy the mutuality of obligation on which a covenant not to compete is based.'" *Arakelian*, 735 F. Supp. 2d at 41 (quoting *Morris v. Schroder Cap. Mgmt. Int'l*, 445 F.3d 525, 529-30 (2d Cir. 2006)).

The parties dispute who terminated the Agreement without cause. After the plaintiff rejected Dr. Landow's proposal to revise the Agreement's compensation formula, Dr. Landow emailed the plaintiff, "If we are unable to reach an accord, pursuant to the [A]greement[,] we will require 60 days prior written notice" of termination without cause. (ECF No. 45-5 at 2.) The plaintiff replied, "[A]s you wish. You have your official written notice of my termination in sixty days." (*Id.*) The plaintiff argues that "while [he] nominally resigned, his resignation was in response [to] Paramount telling him that it was 'required' unless [he] agreed to its proposed modifications to the Agreement, and was, therefore, effectively a termination without cause." (ECF No. 44-2 at 21-22.) The defendant responds that "Dr. Landow's email indicate[d] there was a disagreement as to compensation and Dr. Landow welcomed an amicable parting if it was

unacceptable," and that "if [the plaintiff] was not satisfied or amenable to Dr. Landow's request, under the Agreement he had to provide 60 days' written notice to leave Paramount."  (ECF No. 56 at 26.)

Neither party's argument makes sense.  The Agreement permits both parties to terminate the contract unilaterally without cause with "60 days' prior written notice."  The plaintiff was not required to terminate the contract.  And contrary to the defendant's position, the plaintiff did not have to agree to Dr. Landow's proposed change to the Agreement midway through its term. Notwithstanding termination, the defendant was required to pay the plaintiff pursuant to the original compensation formula until the end of the Agreement's term on December 11, 2018. Therefore, the email exchange between the plaintiff and Dr. Landow could be read as the plaintiff terminating the Agreement voluntarily or the defendant conditioning its continuation on the plaintiff's acceptance of a revised compensation formula.  Because there is a material factual dispute about which party terminated the Agreement, the defendant is not entitled to summary judgment on its breach of contract claim.  *See Kelly v. Evolution Mkts., Inc.*, 626 F. Supp. 2d 364, 371 (S.D.N.Y. 2009) ("[T]he factual determination whether an employee was involuntarily terminated is generally not appropriate for summary judgment." (citing *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 255 (2d Cir. 2002)).

While this dispute of a material fact precludes summary judgment, I consider the plaintiff's remaining arguments to determine whether the defendant's breach of contract claim should be dismissed.  The plaintiff argues that the defendant cannot enforce the restrictive covenant because it breached the implied covenant of good faith and fair dealing by limiting the types of procedures he could perform, and because the defendant breached the Agreement by not paying him on March 10, 2018.  "Even a reasonably limited covenant not to compete is

unenforceable, however, if the employer has breached the employment agreement." *In re UFG Int'l, Inc.*, 225 B.R. 51, 55 (S.D.N.Y. 1998) ("[O]therwise valid covenant against competition is unenforceable 'when the party benefited was responsible for the breach of the contract containing the covenant.'" (quoting *Cornell v. T.V. Dev. Corp.*, 17 N.Y.2d 69, 75 (1966)); *see also Random Ventures, Inc. v. Advanced Armament Corp., LLC*, No. 12-CV-6792, 2014 WL 113745, at *52 (S.D.N.Y. Jan. 13, 2014) (collecting cases), *aff'd as modified sub nom. Thompson v. Advanced Armament Corp., LLC*, 614 F. App'x 523 (2d Cir. 2015). "Initially, the trial court must determine the factual issue of which of the alleged breaches occurred first." *Meteor Indus., Inc. v. Metalloy Indus., Inc.*, 104 A.D.2d 440, 442 (2d Dep't 1984) ("If plaintiffs wrongfully refused to buy out [the defendant], they may not recover damages for any possible breach of the covenant. If [the defendant] was the breaching party, the court must consider whether the time period, geographic limitation and scope of the covenant were reasonable." (internal citation omitted)). As for the plaintiff's claim that the defendant limited the plaintiff to PRP procedures, the plaintiff cites no authority—and the Court is not aware of any—for the proposition that an employer's alleged breach of the implied covenant can render a restrictive covenant unenforceable. Moreover, although the defendant breached the Agreement on March 10, 2018 by not paying the plaintiff, it has established that the plaintiff had already violated the restrictive covenant as early as January of 2018 by independently treating patients at Touch Stone. *See Meteor Indus., Inc.*, 104 A.D.2d at 442. Under these circumstances, the Agreement's non-compete clause is enforceable up until the defendant's breach on March 10, 2018.

The plaintiff also argues that the defendant did not have a "legitimate interest" in the restrictive covenant because it "had no relationship with Touch Stone at the time of the Lease Agreement." (ECF No. 44-2 at 24-25.) "Under New York law, 'negative covenants restricting

competition are enforceable only to the extent that they satisfy the overriding requirement of reasonableness.'" *Freedom Mortg. Corp. v. Tschernia*, No. 20-CV-1206, 2021 WL 1163807, at *3 (S.D.N.Y. Mar. 26, 2021) (quoting *Reed, Roberts Assocs., Inc. v. Strauman*, 353 N.Y.2d 303, 307 (1976)). "A restraint is reasonable only if it: (1) is no greater than is required for the protection of the legitimate interest of the employer, (2) does not impose undue hardship on the employee, and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (1999). Courts in New York have found that a medical employer can have legitimate interest in its patient base, including referral sources. *Battenkill Veterinary Equine P.C. v. Cangelosi,* 1 A.D.3d 856, 859 (3rd Dep't 2003) ("Irreparable injury may be shown through a loss of patients in a medical specialty, permanent loss of revenues from those patients or clients, and loss of referral business usually garnered from clients."); *see also Awwad v. Cap. Region Otolaryngology Head & Neck Grp., LLP,* No. 5334-07, 2007 WL 4623509 at*6 (N.Y. Sup. Ct. 2007) (finding that an employer had "legitimate interests in protecting the goodwill it has developed . . . , its patient base (including referrals garnered from existing clients) and referral relationships"). "Covenants restricting a professional, and in particular a physician, from competing with a former employer or associate are common and generally acceptable." *Gelder Med. Grp. v. Webber*, 363 N.E.2d 573, 576 (1977) (citing *Karpinski v. Ingrasci*, 268 N.E.2d 751, 752-53 (1971)). As one of the defendant's referral sources, Touch Stone "would refer patients who they believed needed pain management care to Paramount." (ECF No. 56 at 12.) The plaintiff claims that in December of 2017, the defendant and Touch Stone discussed but ultimately did not enter into a lease and services agreement. (ECF No. 44-2 at 24-25.) He does not explain what the contemplated agreement entailed, or whether the stalled discussions meant that Touch Stone would no longer refer patients to the defendant. Moreover, the defendant

contends that its referral relationships were not always formalized in writing.  (ECF No. 56 at 28.)  Therefore, the plaintiff has not established that the defendant and Touch Stone ended their referral relationship before he began working with Touch Stone on his own, and the defendant had a legitimate interest in protecting that referral relationship.

Finally, the plaintiff argues that the Agreement's restrictive covenant is unreasonable because its term of two years is too long.  As the defendant points out, New York courts have held that two years is a reasonable period for a non-competition term, including for medical professionals.  *See Gelder Med. Grp.*, 363 N.E.2d at 577 ("[I]t was quite reasonable to limit the noncompetition term to five years."); *Albany Med. Coll. v. Lobel*, 296 A.D.2d 701, 701 (3rd Dep't 2002) (five years); *Awwad*, 2007 WL 4623509 at*4 (three years).[18]

---

[18] The plaintiff argues that "New York courts have refused to enforce Non-Competes for doctors that are even two years long" (ECF No. 44-2 at 26), but cites cases in which the issue was the restrictive geographic scope of the covenants, not their durations.  *See Long Island Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.*, 164 A.D.3d 575, 578 (2d Dep't 2018) (holding that a restrictive covenant was "geographically unreasonable, because it effectively barred [a doctor] from performing surgery . . . in the New York metropolitan area"); *Goodman v. N.Y. Oncology Hematology, P.C.*, 101 A.D.3d 1524, 1528 (3d Dep't 2012).

**CONCLUSION**

For these reasons, summary judgment is granted in favor of the plaintiff as to his breach

of contract claim.  Summary judgment is denied with respect to the amount of damages to which

the plaintiff is entitled under his breach of contract claim, but he may request an inquest to

establish breach of contract damages, exclusive of attorney's fees and filing fees.  Summary

judgment is granted in favor of the defendant as to the plaintiff's claims for unjust enrichment,

quantum meruit and violation of New York Labor Law and NY COBRA.  Summary judgment is

denied with respect to the defendant's breach of contract claim.


**SO ORDERED.**

                                 s/Ann M. Donnelly
                               _____
                               ANN M. DONNELLY
                               United States District Judge


Dated: Brooklyn, New York
           February 28, 2022